## COMMONWEALTH *vs.* JOSE CORREIA.

Plymouth.    March 9, 1984. — May 30, 1984.

Present: ARMSTRONG, ROSE, & SMITH, JJ.

*Assault with Intent to Murder. Practice, Criminal,* Instructions to jury,
    Presumptions and burden of proof.

At the trial of indictments charging assault with intent to murder, the judge's
    instructions to the jury, read as a whole, did not create a mandatory
    presumption of specific intent which impermissibly shifted to the defend-
    ant the burden of proof. [181-182]

At the trial of indictments charging assault with intent to murder, the judge's
    failure to define heat of passion or provocation in instructing the jury
    on assault with intent to kill as a lesser included offense did not create
    a risk of a miscarriage of justice, where the only evidence of provocation
    was that one of the victims had told the defendant that she had spent
    the evening with another man and that she intended to sever her relation-
    ship with the defendant, evidence insufficient to negate a finding of
    malice. [182-185]

At the trial of an assault case, the judge's reference in his charge to the jury to
    the function of appellate courts where the judge continued by stating
    that the jury "alone [has] the right and responsibility to decide the facts;
    no one else can do that, that is [the jury's] responsibility" did not create
    a risk of a miscarriage of justice. [185]

INDICTMENTS found and returned in the Superior Court De-
partment on February 23, 1982.

The cases were tried before *Sheehan, J.*

*Eric Brandt* for the defendant.

*Robert S. Sinsheimer,* Assistant District Attorney, for the
Commonwealth.

ROSE, J.    The defendant appeals from two convictions of
armed assault with intent to murder (G. L. c. 265, § 18),
assigning as reversible error certain of the trial judge's final
instructions to the jury. The defendant contends that in his
instructions the judge: (1) created a mandatory presumption

with respect to "specific intent," improperly shifting the burden of proof on that element to the defendant; (2) created confusion with respect to the state of mind necessary for the lesser included offense of assault with intent to kill; and (3) created a substantial risk of a miscarriage of justice by informing the jurors of the availability of appellate courts to correct any errors of law made by the trial judge. We affirm the convictions.

The Commonwealth presented evidence from which the following facts could be found. Nancy Tanner met the defendant in September, 1981, and began living with him shortly thereafter. In early December, 1981, Tanner moved out of the defendant's apartment and moved in with her friend of fifteen years, Connie Sanborn. Tanner continued seeing the defendant about four nights each week.

On the afternoon of January 16, 1982, a Saturday, the defendant went to Sanborn's apartment in Brockton with two friends. Tanner and Sanborn were there playing cards with one Rafael. The defendant asked Tanner if she would come with him to a neighborhood bar. She declined but said that she might see him there in the evening. The defendant left. Later, Tanner, Sanborn and Rafael went to a different bar. Sanborn and Rafael left between 10:30 and 11:00 P.M.; Tanner left shortly thereafter to go to a party on Cape Cod with a friend named Tim. Tanner and Tim arrived at the party near midnight and stayed until approximately 3:00 A.M. They drove back to Brockton and stopped at an "after hours" bar for a drink at 4:30 A.M. or thereabouts. Tanner arrived back at Sanborn's apartment at 5:30 A.M. There, Tanner discovered the defendant sleeping on the floor in front of the door. She asked what he was doing there, and he responded that he had been waiting for her. The defendant indicated that he wanted to talk. Tanner knocked on the door to the apartment and called Sanborn's name; Sanborn let them in. The three sat down at the kitchen table. Tanner and the defendant talked; Sanborn smoked a cigarette.

The conversation between Tanner and the defendant lasted from fifteen to twenty minutes. The defendant asked Tanner where she had been, and Tanner explained that she had been at

a party on Cape Cod with her friend Tim. Both Tanner and Sanborn testified that there were no harsh words or raised voices. Tanner closed the conversation by telling the defendant that she no longer wished to see him and by asking him to leave so that she could get some sleep. Sanborn then asked the defendant to talk to Tanner later, so that they could sleep. There was no further evidence with respect to the details of the conversation.

The defendant agreed to leave and arose from the table. He took a few steps, turned, drew a .32 caliber handgun, aimed at Tanner's face, and fired, wounding her in the neck. Tanner ran to the bathroom to attend to her wound, and then returned to the kitchen. The defendant was then standing in front of Sanborn, who was still seated at the table; he was aiming the gun at her face. He said, "Now it's your turn," and fired, wounding the left side of her face. Sanborn slumped to one side and called for Tanner. The defendant refused to allow Tanner to go to Sanborn's aid. Sanborn fell to the floor, unable to move. The defendant looked at his watch and told Tanner, "I'll kill both of you at eight o'clock."

During the next two hours, the defendant and Tanner argued intermittently. The defendant repeated his threat at least once, still holding the gun in his hand. He refused to allow Tanner or Sanborn to summon an ambulance. He physically restrained Tanner when she made an attempt to escape. When the police arrived in response to a neighbor's report of loud noises, the defendant forced the women to remain silent, threatening them with his gun. Hearing no response to their inquiries, the police left. At eight o'clock, the defendant shot Tanner a second time, again aiming at her face at close range. He wounded her in the mouth and hand. However, Tanner prevailed upon him not to shoot Sanborn again.

Finally, two and one-half hours later, the defendant allowed Tanner and Sanborn to call an ambulance, on their promise that they would not reveal who had shot them. Tanner received emergency surgery and intensive care for the following fifty-seven days. Sanborn was operated upon the following day, and released after a week. The defendant was apprehended on the day of the crimes.

The defendant rested without presenting any evidence.

1.  The defendant contends that the trial judge created a mandatory presumption with respect to "specific intent" by using the following language in his charge to the jury: "[T]his is what is called general intent; we sit down, we get up, we are presumed to, we intended to do that specific intent which is a necessary element."[1] Although both the defendant and the Commonwealth assert that the portion of the charge quoted above contains some stenographic error, neither sought correction of the transcript by the trial judge, pursuant to Mass.R.A.P. 8(e), as appearing in 378 Mass. 934 (1979). See *Commonwealth* v. *Nighelli,* 13 Mass. App. Ct. 590, 598 (1982). The convoluted and inconsistent nature of the quoted portion of the charge, rendering its meaning difficult to extract, and the several references in the transcript to outside noise hampering the audibility of discourse in the courtroom tend to support the assertions of stenographic error. Cf. *Commonwealth* v. *Nighelli, supra.* However, the probable location of the error is not self-apparent. Defense counsel's objection, at the close of the charge, "to the presumption [the judge] stated about general intent" suggests that the error lies in the omission of punctuation confining the reference of the clause "we are pre-

---

[1] The full text of the judge's charge explaining specific intent and distinguishing it from general intent is as follows:

"Now I want to talk to you about specific intent. There are two kinds of intent which may be present in any crime; one of them we refer to as general intent and the other, specific. General intent is a purpose of mind which we all exercise when we have affirmatively decided to do a certain thing. Sometimes it is not the subject of direct contemplation or persuasion for any appreciable amount of time; everybody is not presumed to intend to do what he did in fact do, and the intent when we do such things, many times is present only unconsciously. *This is what is called general intent; we sit down, we get up, we are presumed to, we intended to do that specific intent which is a necessary element.* It differs from general intent in the matter of degree. A specific intent means a definite or precise intent or a particular intent. An intent is the focusing of the mind upon the accomplishment of a certain act having the mind to concentrate. An act is intentional when it is the result of thought, a mental decision or purpose to do it, even though the intent may have sprung up instant[ly], and the act had followed immediately." (Emphasis supplied.)

sumed to" to only the judge's examples of acts evidencing general intent. Cf. *Commonwealth* v. *Dilone,* 385 Mass. 281, 287 n.3 (1982).

Without resolving the question of stenographic error, we conclude that read as a whole, see, e.g., *Commonwealth* v. *Denson,* 16 Mass. App. Ct. 678, 685 (1983), the charge (as it appears in the transcript) did not create a mandatory presumption of specific intent which impermissibly shifted to the defendant the burden of proof on that element of the crimes charged against him. See *Commonwealth* v. *Lowe,* 391 Mass. 97, 108-112 (1984). Compare *Commonwealth* v. *Zezima,* 387 Mass. 748, 751-753 (1982). The judge's careful instructions on the Commonwealth's burden of proof and the jury's "duty" and "choice" to decide whether the necessary intent could be inferred from the evidence[2] prevented any reduction of the Commonwealth's burden of proof on the element of specific intent. There was no error.

2. The defendant contends that the trial judge in his final charge created confusion with respect to the state of mind necessary for the lesser included offense of assault with intent to kill by analogizing it to the state of mind required for manslaughter (see *Commonwealth* v. *Hebert,* 373 Mass. 535, 538

_____

[2] That portion of the charge was as follows:

"Intent may be inferred from all the circumstances. It doesn't have to but it may be inferred. What was said, what was done, what was [*sic*] taken place? Results, things that were said and done, can be inferred whether or not an intent was present. The only way that a jury can ever find intent is by a judgment and valuation of the facts and circumstances before them at the time they are looking for intent. Jurors are entitled to review all the facts and circumstances and weigh that against their common knowledge and experience and draw an inference, if persuaded that the intent, which the law requires, was in fact present. A defendant's intent may be proven, proven by reasonable inferences, from the evidence; it may be. Again, it's your duty, it's your choice to decide whether such inferences are present. The law does not presume intent to murder from the use of a deadly weapon, although you may consider it as evidence of intent. An intent to kill may be inferred from the act of the killing and where a loaded firearm, held by a defendant, is aimed at a person, and is discharged, that the jury would have a right to infer that such defendant intended to discharge it and to cause the bullet to hit the person at whom the firearm was aimed, but they do not have to."

[1977]), without defining provocation and heat of passion, while making reference to the elements of involuntary manslaughter.[3] As the trial judge noted during the bench conference following the final charge, the defendant's requested instructions were delivered to the jury "almost verbatim."[4] The defendant did not request any instruction defining provocation or heat of passion. Nor did he object to the judge's failure to give such an instruction or to the judge's mention of the elements of involuntary manslaughter. In these circumstances, we may properly "hold the defendant to his choice of instructions at trial." *Commonwealth* v. *Amaral,* 389 Mass. 184, 188 n.3 (1983).

However, we consider whether on either conviction the alleged defects in the instructions on assault with intent to kill resulted in a "substantial risk of a miscarriage of justice," see *Commonwealth* v. *Freeman,* 352 Mass. 556, 564 (1967), and we conclude that they did not. The judge's failure to define

---

[3] Involuntary manslaughter is a crime logically impossible in this case. See *Commonwealth* v. *Parenti,* 14 Mass. App. Ct. 696, 699-703 (1982).

[4] The defendant requested the following instructions with respect to the elements of assault with intent to kill:

> "Murder is the intentional killing of a human being with malice aforethought. Manslaughter is an example of a homicide or a killing though intentional which is not murder. Manslaughter has been defined by our Supreme Judicial Court as "the unlawful killing of another without malice; and may be . . . voluntary, as when the act is committed with a real design and purpose to kill, but through the violence of sudden passion, occasioned by some great provocation . . . The characteristic distinction between murder and manslaughter is malice. . . ."
>
> "The lesser included charge of [a]ssault with [i]ntent to [k]ill would encompass a situation where the killing, if it was accomplished, would constitute manslaughter. In other words, 'If the offense, if completed, would be manslaughter only, the party may be convicted of an assault with intent to kill only, or may be convicted of an assault only.'" (Citations omittted.)

The defendant's requests for instructions were not included on the Superior Court docket. However, reference to them is made in the transcript. The Commonwealth's attachment of the defendant's requests to its brief was unopposed by the defendant. See Mass.R.A.P. 8(e), as appearing in 378 Mass. 934 (1979), and 16(k), 365 Mass. 851, 863 (1974).

provocation or heat of passion could not have resulted in a miscarriage of justice in either conviction since there was no evidence of provocation sufficient, as matter of law, to negate malice with respect to the attacks on either victim. Cf. *Commonwealth* v. *Benjamin,* 369 Mass. 770, 773-774 (1976); *Commonwealth* v. *Bermudez,* 370 Mass. 438 (1976); *Commonwealth* v. *Brown,* 387 Mass. 220, 228 (1982); *Commonwealth* v. *Amaral,* 389 Mass. at 187-189. Compare *Commonwealth* v. *Schnopps,* 383 Mass. 178 (1981). Neither Tanner's report to the defendant that she had spent the evening with another man nor her communication to him of her intention to sever their relationship was provocation sufficient, as matter of law, "'to produce in an ordinary person such a state of passion, anger, fear, fright, or nervous excitement as would eclipse his capacity for reflection or restraint.'" *Commonwealth* v. *Amaral,* 389 Mass. at 188. See *Commonwealth* v. *Soaris,* 275 Mass. 291, 295, 299 (1931) (where defendant's fiancée publicly taunted him while she danced with another man, and thereafter continued to ridicule him privately, whereupon the defendant shot her, it was "plain the evidence did not warrant a finding of manslaughter"); *Commonwealth* v. *Bermudez,* 370 Mass. at 439-440 (where defendant killed his estranged wife after she had used an obscenity, told defendant she had another man, and told him to get out, "the evidence would not warrant a finding that sufficient provocation existed" to reduce the crime to manslaughter).[5]

There is no evidence that Sanborn said or did anything to provoke the defendant. See *Commonwealth* v. *Robinson,* 14 Mass. App. Ct. 591, 598-600 (1982). There must be "a causal connection between the provocation, the heat of passion, and the killing" to justify an instruction on provocation. *Ibid.*, quot-

---

[5] See also *Commonwealth* v. *Leate,* 352 Mass. 452, 458 (1967) (defendant's "sight of his woman companion, her clothes dirty and in disarray, crying hysterically that [the deceased] had attempted to rape her . . . would not be deemed reasonable" provocation); *Commonwealth* v. *McGuirk,* 376 Mass. 338, 345, cert. denied, 439 U.S. 1120 (1978) ("Even if the woman in his apartment had been the defendant's girlfriend . . . jealousy or anger at finding her with another man would not serve as sufficient provocation to reduce his act [of killing the man] to manslaughter").

ing from *Commonwealth* v. *Schnopps,* 383 Mass. at 180-181. See also *Commonwealth* v. *Burke,* 376 Mass. 539, 543 n.2 (1978).

3. The defendant also contends that the trial judge created a substantial risk of a miscarriage of justice by remarking to the jury: "[T]he law requires you to take the law from me, even if you don't like it, you must accept the law as I give it to you. If I am wrong, there are other courts above that will take care of that condition." The judge followed the above quoted remarks with an instruction to the jury that the jury, "alone, [has] the right and responsibility to decide the facts; no one else can do that, that is [the jury's] responsibility." In these circumstances, the judge's reference to the availability of appellate review "did not have the 'inescapable effect of reducing the jurors' appreciation of the significance of their deliberation and verdict.'" *Commonwealth* v. *Johnson,* 379 Mass. 177, 182 (1979), quoting from *Commonwealth* v. *Walker,* 370 Mass. 548, 574, cert. denied, 429 U.S. 943 (1976).

*Judgments affirmed.*