# John Miller, petitioner.

No. 06-P-1815.

Berkshire. January 8, 2008. - April 30, 2008.

Present: Green, Katzmann, & Grainger, JJ.

*Sex Offender. Practice, Criminal,* Instructions to jury, Sentence. *Practice, Civil,* Instructions to jury, Directed verdict. *Constitutional Law,* Sentence. *Due Process of Law,* Sentence.

The petitioner, who sought to be discharged from his commitment to the Massachusetts Treatment Center as a sexually dangerous person, failed to demonstrate any prejudice arising from the judge's instruction to the jury that the petitioner annually could file a petition for discharge, where, although it would have been best if the judge had not given the instruction (which introduced a possible extraneous factor into the jury's deliberations), the instruction did not have the inescapable effect of reducing the jurors' appreciation of the significance of their deliberations and verdict, in that the instruction was one sentence in a lengthy and well-researched charge, the judge repeatedly made clear that the Commonwealth bore the burden of proving beyond a reasonable doubt that the petitioner remained a sexually dangerous person, and the evidence of the petitioner's continuing sexual dangerousness was overwhelming. [626-635]

The evidence at the trial of a petition seeking the petitioner's discharge from his commitment to the Massachusetts Treatment Center was more than sufficient, when viewed in the light most favorable to the Commonwealth, to support the conclusion that the petitioner remained a sexually dangerous person. [635]

The petitioner's civil commitment to the Massachusetts Treatment Center as a sexually dangerous person did not unconstitutionally incarcerate him on the basis of crimes for which he had already served his sentence, where the focus of the commitment inquiry was the petitioner's current mental condition and future dangerousness, not his earlier crimes. [635-636]

Petition filed in the Superior Court Department on October 9, 2001.

The case was tried before *Joseph M. Walker, III,* J.

*Janet Hetherwick Pumphrey* for the petitioner.

*Brendan J. Frigault* for the Commonwealth.

KATZMANN, J. On January 6, 1989, the petitioner was found to be a sexually dangerous person as defined in G. L. c. 123A, and was committed to the Massachusetts Treatment Center at Bridgewater (treatment center) for a term of from one day to life. On October 9, 2001, he filed a petition pursuant to G. L. c. 123A, § 9, seeking discharge from his commitment to the treatment center. A Superior Court jury returned a verdict that the petitioner remained a sexually dangerous person as defined by G. L. c. 123A, § 9. The petitioner now appeals on three grounds, arguing principally that the judge's instruction to the jury — explaining that the petitioner may annually file a petition for discharge from the treatment center — introduced an extraneous consideration into the jury's deliberations, inviting a subtle and impermissible lowering of the Commonwealth's burden of proof. We need not decide whether the mention of the availability of an annual review petition is error, because even if it were, the petitioner has failed to demonstrate any prejudice. We do conclude that the better practice is to refrain from giving such an instruction.

1. *Jury instruction.* In § 9 discharge proceedings,[1] the Commonwealth bears the burden of demonstrating that the petitioner seeking release remains a sexually dangerous person. *Wyatt, petitioner*, 428 Mass. 347, 352 (1998). In his pretrial instructions to the venire and again in the charge to the jury, over objection, the judge, tracking the statute, informed the jurors that the petitioner may annually bring a petition under G. L. c. 123A,

---

[1]General Laws c. 123A, § 9 (petitions for examination and discharge), as amended through St. 1989, c. 555, provides, in relevant part:

"Any person committed to the treatment center shall be entitled to file a petition for examination and discharge once in every twelve months. Such petition may be filed by either the committed person, his parents, spouse, issue, next of kin or any friend. The department of correction may file a petition at any time if it believes a person is no longer a sexually dangerous person. . . . Said petition shall be filed in the district of the superior court department in which said person was committed. The petitioner shall have a right to a speedy hearing on a date set by the administrative justice of the superior court department. . . . In any hearing held pursuant to the provisions of this section, either the petitioner or the commonwealth may demand that the issue be tried by a jury. If a jury trial is demanded, the matter shall proceed according to the practice of trial in civil cases in the superior court."

§ 9, seeking a determination that he is no longer a sexually dangerous person. Thus, in his pretrial instruction, the judge stated: "As is his right, every year [the petitioner] has petitioned for a hearing to determine whether he remains a sexually dangerous person as defined by Massachusetts law."[2] The judge continued, "[I]t will be the jury's duty to determine whether based upon [the] evidence and the applicable law, as I will give you, the petitioner remains a sexually dangerous person *today*" (emphasis added). In his jury charge, the judge instructed:

> "This is a petition brought pursuant to Section 9 of Chapter 123A which provides, in relevant part, that any person committed as a sexually dangerous person shall be entitled to file a petition for examination and discharge once very 12 months. When, as in this case, such a petition is filed, the sole issue to be determined by you, the jury, is whether the petitioner remains a sexually dangerous person today."

The instructions flowed simply from the judge's apparent (and understandable) effort to give the jury some context for their responsibility in assessing the evidence, based on the statute permitting petitions for discharge from commitment. The petitioner argues that these two instructions invited the jury to believe that their verdict "did not matter because if they found the petitioner to remain a sexually dangerous person, in just a few months he could bring his case to another jury. That result lowered the Commonwealth's burden of proving the case beyond a reasonable doubt and violated the defendant's constitutional right to have the State prove all of the elements."[3]

The issue presented by the petitioner has not been adjudicated

[2]There is no reference in the record whether past juries adjudicated any prior petitions that may have been filed.

[3]Before we can reach this issue, we must dispose of the Commonwealth's argument that the issue is waived due to counsel's failure to object to the language at issue at the conclusion of the judge's charge to the jury. See *McHoul, petitioner*, 445 Mass. 143, 157 (2005), cert. denied, 547 U.S. 1114 (2006) (where petitioner fails to request jury instruction on matter and does not object to particular aspect of charge, issue is waived on appeal). Here, after the initial day of jury selection, the petitioner's counsel filed a motion to disqualify the entire venire on several grounds, including that the judge's instruction on the petitioner's statutory right to petition for release annually was prejudicial. Counsel argued specifically that informing the jury of the

in the context of § 9 proceedings. We take guidance, however, from cases in other settings, which decided arguments of a similar tenor. Over time, defendants have objected to reference to the appellate process or the right of appeal on the ground that "[s]uch remarks implicitly tell the jurors not to be overly concerned about rendering hasty or 'correct' verdicts, since the defendant is adequately protected by the process of appeal to higher tribunals." *Commonwealth* v. *Walker*, 370 Mass. 548, 574, cert. denied, 429 U.S. 943 (1976). See *Commonwealth* v. *Allen*, 377 Mass. 674, 680-681 (1979); *Commonwealth* v. *Johnson*, 379 Mass. 177, 182 (1979); *Commonwealth* v. *Conceicao*, 388 Mass. 255, 267 (1983); *Commonwealth* v. *Correia*, 18 Mass. App. Ct. 178, 185 (1984). See also *Commonwealth* v. *Tracy*, 50 Mass. App. Ct. 435, 442 (2000). While courts have determined that injecting the "extraneous" issue of appellate rights is generally ill advised — and that the better practice is to refrain from alluding to that right — they have also determined that such reference does not constitute reversible error because those remarks do not "have the inescapable effect of reducing the jurors' appreciation of the significance of their deliberations and verdict." *Walker, supra.* See *Allen, supra* ("caution[ing] against mention of the appellate process"); *Correia, supra* (judge also instructed jury that they "alone[ have] the right and responsibility to decide the facts; no one else can do that, that is [the jury's] responsibility"). Similarly here, as shall be developed *infra*, the judge's instruction regarding the right to petition for annual review did not have the inescapable effect of reducing the jurors' appreciation of the significance of their delibera-

---

annual right would impermissibly "lessen[] the [Commonwealth's] burden." Noting the petitioner's objection on the record, the judge denied the motion. Following the denial, the petitioner's counsel immediately moved for a mistrial on the same grounds. The judge denied the motion, but noted the petitioner's continuing objection on the record.

While it is preferable for counsel to object after the completion of the jury charge, counsel, in this case, did object to the instruction during the precharge conference at the conclusion of the evidence. Counsel followed the objection with an extensive legal argument on the basis for the objection, concluding with the statement: "This language has no relevance . . . so I ask that it be excised." The judge noted the objection. Given these objections, which are noted on the record, we conclude that the issue is not waived on appeal. See *id.* at 155-156 (objection preserves appellate review of instruction where objection made on record).

tions and verdict, and reversal is not warranted — although the best practice is that the instruction be omitted.

We also note that besides cases addressing the injection of appellate rights, Massachusetts courts have long held it improper to place before the jury in criminal trials other extraneous factors, such as sentence or punishment, which are not within the jury's province. Consideration of such matters may "interfer[e] with or even totally eclips[e] the jury's deliberations with respect to the evidence before them." *Commonwealth* v. *Ferreira*, 373 Mass. 116, 126 (1977).

> "A jury's verdict must be based solely on the evidence in the case, without regard to the possible consequences of their decision. . . . The role of the jury is to make findings of fact and to determine the guilt or innocence of the accused without regard to probable punishment. To inform jurors of the sentencing consequences of their verdicts is to invite result-oriented verdicts and possible deviation from the basic issues of a defendant's guilt or innocence."

*Commonwealth* v. *Sanchez*, 70 Mass. App. Ct. 699, 701 (2007), quoting from *Commonwealth* v. *A Juvenile (No. 1)*, 396 Mass. 108, 112 (1985). See *Commonwealth* v. *Mutina*, 366 Mass. 810, 817 (1975) ("The principal argument for rejecting the practice of instructing juries as to the legal consequences of their verdicts in criminal cases seems to lie in the conviction that, in reaching their verdicts, jurors should be shielded from extraneous influences and should arrive at their verdicts only on a dispassionate consideration of the relevant and credible evidence presented to them in the adversary process").

The jury's function is "solely one of fact finding" by applying the appropriate legal standards to the question of innocence or guilt, "not to weigh possible verdicts with an eye toward dispensing mercy in certain cases or imposing heavier penalties in others." *Ferreira*, *supra* at 124. In sum, as the Supreme Judicial Court explained in *Mutina*, *supra*:

> "To inform jurors of the consequences of their verdicts is apparently seen, and in most cases with good cause, as inviting result-oriented verdicts and possible deviation from the basic issues of a defendant's guilt or innocence.

This process, if allowed without restriction, could lead to the jury's usurpation of the judge's sentencing prerogatives and duties and the Legislature's policy determining functions."

The proper application of these principles to a civil hearing concerning the petitioner's continued commitment to the treatment center for remedial sex offender treatment is an issue of first impression in the Commonwealth. Of course, in § 9 proceedings, unlike in most criminal trials where the consequences of the jury's verdict — punishment — is the judge's prerogative alone, the jury are very much aware that their determination whether a defendant continues to be a sexually dangerous person will determine whether he continues to be confined. At the same time, we see no reason why the better practice articulated in our criminal jurisprudence — that the jury be shielded from extraneous influences that might divert them from their proper decisionmaking function — should not be applicable to a § 9 proceeding. While § 9 proceedings are nonpunitive, see *Commonwealth* v. *Bruno*, 432 Mass. 489, 499-502 (2000) (due to their remedial nature, proceedings under G. L. c. 123A do not amount to punishment), they do implicate liberty interests, see *id.* at 502-503, and therefore, we are persuaded that the principles elucidated in *Mutina* and its progeny are applicable to § 9 hearings. See *Commonwealth* v. *Gillis*, 448 Mass. 354, 357 (2007), quoting from *Commonwealth* v. *Beck*, 187 Mass. 15, 17 (1904) (extending rule that "[l]aws in derogation of the liberty or general rights, of the citizen . . . are to be strictly construed" from its normal confines of criminal law to G. L. c. 123A proceedings because of due process considerations at stake). See also *Commonwealth* v. *Dresser*, *ante* 454, 458 (2008) ("Certain rights ordinarily afforded criminal defendants have been extended to those civilly charged with being sexually dangerous persons, e.g., the right to counsel, the right to have counsel appointed if the defendant is indigent, the right to call expert witnesses [and, if indigent, the right to have the Commonwealth pay for them], the right to have process issue to secure the attendance of witnesses, the right to a unanimous jury verdict, the requirement that the case be proven beyond a reasonable doubt. See G. L. c. 123A, § 14[*b*] & [*d*]"). As such, we conclude that the instruc-

tion to the jury — that the petitioner, if found to remain sexually dangerous, would have a statutory right to petition again in one year — introduced a possible extraneous factor into the jury's deliberations, albeit minimally here, and was best left omitted.

In the § 9 context, the jury's function is solely to determine whether, at the time the verdict is rendered, the petitioner remains a sexually dangerous person as defined in G. L. c. 123A. However, in this case, the judge's instruction potentially diverted the jury from their role; there was a risk that the instruction may have inadvertently invited the jury to dispense with the question presented by rationalizing the finding of continued sexual dangerousness on the ground that the petitioner could again petition for release within a year. There was a risk that the verdict was result oriented and that the jury's deliberations were improperly influenced by the contemplation that they could abdicate their responsibility to determine whether the petitioner remained sexually dangerous because they knew that a determination that the petitioner remained sexually dangerous only meant that in but another year's time some other jury, upon another petition, would assume responsibility for this determination. Such a calculus, albeit subtle, would be impermissible. See *Sanchez*, 70 Mass. App. Ct. at 701.

However, where the judge instructs the jury such that there is a risk of an inappropriate extraneous factor entering into their decision-making, such an instruction does not necessitate automatic reversal. See *Commonwealth* v. *Smallwood*, 379 Mass. 878, 883 (1980) (jury instruction that death penalty was not available sentence did not create reversible error). See also *Commonwealth* v. *Medeiros*, 395 Mass. 336, 349-350 (1985); *Sanchez, supra* at 702. Compare *Ferreira*, 373 Mass. at 123-125 (reversible error when judge's charge explained to jury that verdict of guilty of murder in first degree would carry sentence of life imprisonment without parole, while verdict of guilty of murder in second degree would carry same sentence, but with eligibility for parole after fifteen years). Here, for the reasons we shall explain, the petitioner's claim of reversible error is unavailing.

The petitioner's concern here, that the jury's knowledge that

in another year another jury could consider his petition in the event he were not discharged would invite the jury to evade their responsibility to assess his current dangerousness and to take the easier route of settling on the status quo of continuing confinement, arises from an argument built on subtle inference, not on direct command to the jury. The judge's instruction in the final jury charge (and in the pretrial instruction) was just one sentence in a lengthy and well-researched charge. See *McHoul, petitioner*, 445 Mass. 143, 156 (2005), cert. denied, 547 U.S. 1114 (2006), quoting from *Gilchrist* v. *Boston Elevated Ry.*, 272 Mass. 346, 363 (1930) ("[A] charge is to be considered as a whole to determine whether it is legally correct, rather than tested by fragments which may be open to just criticism"). Moreover, as in *Smallwood, supra* at 883, and *Medeiros, supra* at 350, the judge "minimized any untoward influence" by instructing the jury at two points that "the sole issue to be determined by you, the jury, is whether the petitioner remains a sexually dangerous person today." See and compare *Commonwealth* v. *Correia*, 18 Mass. App. Ct. at 185 (where judge also instructed jury that they, and "no one else," had sole responsibility to decide facts, "judge's reference to the availability of appellate review 'did not have the "inescapable effect of reducing the jurors' appreciation of the significance of their deliberation and verdict." ' *Commonwealth* v. *Johnson*, 379 Mass. 177, 182 [1979], quoting from *Commonwealth* v. *Walker*, 370 Mass. 548, 574, cert. denied, 429 U.S. 943 [1976]"). The judge also made clear repeatedly, at seven points during the charge, that although the petitioner had filed the petition for discharge from commitment, it was the Commonwealth's burden to prove beyond a reasonable doubt that the petitioner remains a sexually dangerous person. The jury were clearly instructed that "[t]he petitioner need not prove that he is no longer a sexually dangerous person." The judge also directed that the jury consider "only . . . the legal evidence presented" on the question whether the petitioner continued to be sexually dangerous. Furthermore, in emphasizing that the jury should consider only the evidence in reaching their decision, the judge also instructed the jury that they were not to "base that decision on what your feelings or opinions may be regarding the law that permits the petitioner to

be confined at the treatment center." We do not assume that the jury failed to heed the judge's instructions. See *Smallwood, supra* at 883. Indeed, jurors are presumed to follow a judge's instructions. See *Commonwealth* v. *Montez,* 450 Mass. 736, 746 (2008), citing *Commonwealth* v. *Johnson,* 45 Mass. App. Ct. 473, 479 (1998).

Finally, the evidence of the petitioner's continuing sexual dangerousness was overwhelming. During the six-day trial, the Commonwealth presented the testimony of three expert witnesses[4]; the defendant did not testify or present witnesses. Here, it is undisputed that in the early and mid-1980's, the petitioner engaged in an escalating pattern of violent sex offenses against young children; first girls, then boys. The jury heard evidence that certain factors associated with that conduct — the multiple prior offenses, the reoffending while on probation, the young age of the victims, the onset of offending at age fourteen, the fact of having unrelated and stranger victims, the degree of violence used, the public setting for several of the offenses, the degree of deviant sexual arousal, and the sex of certain victims — increased the petitioner's risk of reoffense. Moreover, the jury heard evidence that the petitioner, despite treatment, continued to exhibit deviant sexual arousal and anger management problems, got into a physical altercation with another patient in 2003, continued to exhibit cognitive distortions in processing information learned in his treatment program, and had significant difficulties with integrating sex offender treatment, especially when placed in the community transition house in 1998.

Furthermore, the jury heard evidence that the petitioner "did not have a clear, well-formulated release plan" to aid his transition to the community. Based on the earlier offenses and the more recent episodes, the jury heard opinions from the several experts that the petitioner met the criteria for pedophilia (a chronic, ongoing condition), sexual sadism, and antisocial personality disorder, which were all relevant to the petitioner's likelihood of reoffense.

[4] The Commonwealth offered the testimony of Dr. Ira Silverman, a member of the community access board; Dr. Christine Schnyder Pierce; and Dr. Frederick Kelso. Both Kelso and Pierce are qualified examiners, as designated by G. L. c. 123A.

While the petitioner claims that he made significant progress in treatment, this contention misrepresents the witnesses' ultimate conclusions, which were that the petitioner had not sufficiently completed sex offender treatment. Specifically, there was testimony that "[t]he treatment team in his treatment is recommending that he continue to engage in behavioral treatment which would be focused on deviant sexual arousal"; "[h]e has been engaged in sex offender treatment for many years, but no one has reported, at least at the treatment center or his treatment team, that he has completed his treatment or [is] close to completing his treatment; [and,] [n]ow, notwithstanding [the petitioner's prior treatment] achievements, as I evaluated [the petitioner] and as I looked at all of his behavior, I found myself seeing him as a man who had difficulty translating the abstract concepts of things that he had learned in the treatment programs into real-life, day-to-day, concrete, observable, sustained changes in his behavior . . . . I decided, in my opinion, he had not yet fully completed the sex offender treatment available to him." The witnesses also opined that further avenues of necessary treatment include seeking additional treatment for anger management and deviant sexual arousal and for developing a realistic release plan. Also noted was the absence of treatment on the petitioner's association of physical violence and women. Lastly, while the jury heard evidence that the petitioner passed twenty-nine classes, they also heard that he did not pass twenty-six.

Here, the evidence demonstrated that the petitioner had previously been convicted of enumerated sex offenses, that he had personality disorders, and that he was likely to reoffend if not confined to a secure facility. See G. L. c. 123A, § 1. The evidence was overwhelming that the petitioner remained sexually dangerous. Compare *Ferreira*, 373 Mass. at 127 (question of guilt "was not so free from doubt as to render the [erroneous] charge harmless beyond a reasonable doubt"). In light of all these factors, we conclude that even if the instruction were deemed error, there was no reversible error.

In sum, we conclude that in pretrial and final instructions in § 9 discharge proceedings, the better practice is that judges should not charge the jury that every twelve months the petitioner has a statutory right to file a petition for examination and

discharge (nor should the Commonwealth or petitioner allude to that statutory right in their presentation of the evidence). Rather, the jurors should be instructed that their responsibility is solely to determine whether the Commonwealth has met its burden of establishing that, as of the time of the hearing, the petitioner remains sexually dangerous.

2. *Denial of the motion for a directed verdict.* The petitioner also contends that the judge erred in denying his motion for a directed verdict. The means to test the sufficiency of the evidence at a § 9 trial is by a motion for a directed verdict. See *McHoul, petitioner*, 445 Mass. at 157. "A motion for a directed verdict . . . may be granted only when the evidence construed most favorably to the [opposing party] is insufficient to support the verdict in its favor." *Cherick Distribs., Inc.* v. *Polar Corp.*, 41 Mass. App. Ct. 125, 126 (1996), citing *Alholm* v. *Wareham*, 371 Mass. 621, 627 (1976). Here, the petitioner argues that the Superior Court judge erred in denying the motion for a directed verdict because the sole evidence offered by the Commonwealth to prove sexual dangerousness was his past sex crimes. The petitioner further argues that there was significant progress resulting from his treatment, and the Commonwealth did not prove beyond a reasonable doubt that he remains sexually dangerous. This argument is contrary to the evidence, recited above. That evidence, when viewed in the light most favorable to the Commonwealth, was more than sufficient to satisfy the directed verdict standard on the point whether the petitioner remains a sexually dangerous person — indeed, as we have noted, it was overwhelming.

3. *Constitutionality of G. L. c. 123A.* The petitioner asserts that G. L. c. 123A, as applied in this case, violates his due process rights because he continues to be incarcerated on the basis of crimes for which he has already served his sentence. The petitioner therefore argues that his commitment amounts to an enhanced sentence for his earlier crimes. This argument runs counter to precedent.

In *Commonwealth* v. *Bruno*, 432 Mass. at 498, the Supreme Judicial Court explained that:

"the conduct triggering the statute's application is not the

> prior conviction of a sexual offense, but the current mental condition of the defendant. . . . The focus of the definition of 'sexually dangerous person' and the statute's various sections relating to the procedures governing commitment is a defendant's current mental condition."

In *Dutil, petitioner*, 437 Mass. 9, 16 (2002), the Supreme Judicial Court reiterated the view that c. 123A "requires the Commonwealth to prove a present mental condition that results in uncontrolled sexual impulses." See *Bruno, supra* ("That a person, in addition to possessing the requisite current mental condition, must have been convicted of a sexual offense, only identifies and limits the class of persons subject to potential commitment under c. 123A"). Read in conjunction, it is clear that the focus of the c. 123A inquiry is on the defendant's current mental condition and future dangerousness, not his earlier crimes. Moreover, as we discussed above, the petitioner's argument that his commitment is based solely on static factors is misplaced. Cf. *id.* at 506 ("the Commonwealth's current petition is not predicated only on [the petitioner's] prior criminal history" but also on conduct subsequent to criminal acts and earlier evaluations). The evidence that the petitioner remains sexually dangerous is overwhelming.

The jury's finding that the petitioner remains a sexually dangerous person is therefore affirmed.

*Order denying petition affirmed.*