# Commonwealth *vs.* Ricardo S. Mazzarino.[1]

No. 10-P-755.

Suffolk. September 15, 2011. - March 1, 2012.

Present: Vuono, Sikora, & Hanlon, JJ.

*Sex Offender. Evidence,* Sex offender. *Practice, Civil,* Sex offender, Mistrial, Assistance of counsel.

In a Superior Court action arising from the Commonwealth's petition for the defendant's commitment as a sexually dangerous person under G. L. c. 123A, § 14, there was no abuse of discretion in the judge's denial of the defendant's motion for a mistrial, where any prejudice that might have been caused by a witness's testimony concerning the defendant's prior sexual offense charges was sufficiently remedied when the trial judge promptly struck the witness's entire answer and issued a curative instruction during his final charge [363-364]; further, the judge's brief explanations of the procedure under G. L. c. 123A, § 9 (i.e., that the defendant could petition for release every twelve months), were necessary to explain witnesses' answers, did not lower the Commonwealth's burden of proof, and, at any rate, were not unduly prejudicial in light of the trial judge's meticulous and repeated instructions concerning the Commonwealth's burden of proof [364-365].

In a Superior Court action arising from the Commonwealth's petition for the defendant's commitment as a sexually dangerous person under G. L. c. 123A, the admission in evidence of a victim impact statement, even if error, did not result in undue prejudice to the defendant, where the statement was short and added little to the otherwise considerable amount of evidence already admitted, and where the judge instructed the jury not to base their verdict on bias, prejudice, or sympathy [365-366]; further, there was no error in permitting the qualified examiners to testify that the defendant refused to speak with them on advice of counsel [366-368].

In a Superior Court action arising from the Commonwealth's petition for the defendant's commitment as a sexually dangerous person under G. L. c. 123A, there was no merit to the defendant's claim that his trial counsel rendered ineffective assistance by failing to keep from the jury the fact that the defendant was charged with, but not convicted of, other sexual offenses. [368-369]

There was no merit to the argument that an individual's commitment as a sexually dangerous person based on a diagnosis of antisocial personality disorder violated his constitutional rights to due process. [369-370]

---

[1]The defendant has also been known as Richard Vega.

CIVIL ACTION commenced in the Superior Court Department on February 26, 2008.

The case was tried before *Thomas E. Connolly*, J.

*Brandon L. Campbell* for the defendant.

*John Zanini*, Assistant District Attorney (*Anna Rachel Dray-Siegel*, Special Assistant District Attorney, with him) for the Commonwealth.

HANLON, J. The defendant appeals from a Superior Court judgment and order of commitment finding that he is a sexually dangerous person (SDP). See G. L. c. 123A, § 14(*d*). We affirm.

*Background.* On August 7, 1987, the defendant, who was twenty-five years old at the time, vaginally and anally raped a seventy-two year old woman after manipulating his way into the Revere apartment where she was staying with her son.[2] In November, 1990, a jury convicted him of three counts of rape; he was sentenced to nineteen and one-half to twenty years at the Massachusetts Correctional Institution at Cedar Junction and an additional nineteen and one-half to twenty years, suspended during ten years' probation, to run from and after the committed portion of the sentence. On February 26, 2008, the district attorney's office, anticipating the defendant's release, filed a petition with the Superior Court for the defendant's commitment as an SDP under G. L. c. 123A.

Prior to trial on the SDP petition, the defendant filed certain motions in limine. First, he asked that the judge exclude "hearsay allegations concerning crimes [he] was charged with, but not convicted of." The judge ruled that the experts would not be permitted "substantively [to] discuss" the details of the allegations that gave rise to prior arrests for sexual offenses.[3] They would, however, be allowed to acknowledge the use of

---

[2] The defendant was arrested for this crime after he was charged with assault with intent to rape and kidnapping a second victim. Charges relating to the second victim were filed without a change of plea, and with the defendant's consent, on December 14, 1990, after he was sentenced for the governing offense.

[3] On July 10, 1984, the defendant was charged with aggravated rape in a separate case that was dismissed; the reasons for the dismissal do not appear in the record. On September 7, 1984, the defendant was charged with, among other things, rape of a male victim; those charges were also dismissed, again for unknown reasons.

such offenses as part of their diagnostic evaluation in determining whether the defendant was a sexually dangerous person. The defendant did not object to this ruling.

Second, the defendant asked the judge to exclude "[t]he fact that [he], if committed, may petition for release," arguing that admitting this evidence had the potential to lower the Commonwealth's burden of proof because the jury would understand that the commitment was not necessarily "forever." The judge responded that he would "stick with the truth" when admitting evidence pertaining to the G. L. c. 123, § 9, review process. The judge also ruled, over objection, that he would admit evidence of the victim impact statement.

At trial, two psychologists, Carol Feldman and Manju Vachher, testified in their capacity as court-appointed qualified examiners mandated by G. L. c. 123A, § 14; each opined that the defendant was a sexually dangerous person. The defendant also called two experts: Joseph Plaud, a psychologist, opined that the defendant was not sexually dangerous, while Renee Sorrentino, a psychiatrist, testified that there was not sufficient information to make a determination either way. All four experts reviewed the defendant's criminal records, institutional history, classification reports, police reports, and treatment records as part of the evaluation process. The defendant declined to be interviewed by any of the experts.

Dr. Feldman has a Ph.D. in community-social psychology and a J.D. degree. She focused on several factors in explaining her opinion, including the facts of the governing offense. In particular, Dr. Feldman cited the manipulative way the defendant obtained access to the victim, the forty-seven-year gap in their ages, the fact that there was anal as well as vaginal penetration, and the violence of the attack. She also noted the defendant's significant criminal history, which began at age fourteen and included prior sex offense charges. According to Dr. Feldman, this history "speaks to an early inability to conform to the norms of society" and indicated an escalating pattern of criminal behavior and "a chronic inability to control his impulses."[4] The

---

[4] The defendant had been arraigned approximately thirty-six times for other offenses, including other sexual offenses, by the time he committed the governing offense.

defendant's history of disciplinary reports while incarcerated,[5] which included a report for threatening staff, indicated to Dr. Feldman that "despite being in a highly-restricted setting, despite being watched over more or less all the time, . . . [the defendant] is impulsive, is reckless, takes chances that he shouldn't take. He's unable to conform his behavior to the requirements of the institutions." She did not think that probation would be a protective factor for this defendant, in light of the fact that he was on probation at the time he committed the governing offense, combined with his record of eleven court defaults, including one in which he forfeited $20,000 bail. Dr. Feldman also found very significant the defendant's failure to complete sex offender treatment.[6]

As a result, Dr. Feldman concluded that the defendant presented with antisocial personality disorder, lacked impulse control, and had failed to develop "persuasive interventions" to serve as protective factors upon release. She opined that he was a sexually dangerous person and that, if he were released, there would be a high likelihood of reoffense. Finally, Dr. Feldman testified that there is no significant reduction in the likelihood of recidivism associated with the age of forty-six (the defendant's age at time of release); she considered him to be a "young man."

Dr. Vachher has a Ph.D. in clinical psychology, and her testimony essentially paralleled that of Dr. Feldman. She concluded that the defendant suffered from a personality disorder and lacked impulse control. She was particularly concerned that, although the defendant completed some parts of sexual offender

_____

[5]Several disciplinary reports were filed against the defendant while he was incarcerated. They involved allegations of chasing a fellow inmate with a metal pipe; threatening language directed to a unit manager; threatening to punch a correction officer; refusal to continue sexual offender treatment; threatening an officer and refusing a direct order; attempting to bring contraband into the institution through the mail; and threatening staff. The last incidents were alleged to have occurred between September 7, 1999, and March 21, 2002.

[6]The defendant was transferred to the Dallas County, Texas, jail on September 4, 1997, to participate in the sex offender treatment program (SOTP) where he completed phases I, II, and III. Upon his return on November 24, 1998, to the Massachusetts Correctional Institution at Concord, then subsequent transfer to the Massachusetts Treatment Center (treatment center) on March 3, 1999, the defendant refused to continue with the SOTP.

treatment, beginning in 1998, the defendant refused to participate in phase four of the sexual offender treatment — the stage where the treatment becomes individualized and the offender develops a relapse prevention plan. As Dr. Vachher testified, "Research has shown that treatment drop-out in itself is a high-risk factor. People who drop out of treatment do not do well when they are released in the community."

In response to a question from the prosecutor about what factors indicated to her that the defendant was likely to offend, Dr. Vaccher responded, inter alia, "the fact that his victims were unrelated female and males." The defendant objected and the judge struck the entire answer.[7] In his final charge to the jury, the judge gave a curative instruction, ordering them not to speculate on any dismissed charges mentioned during testimony, except to the extent those charges were relied upon by the experts in the evaluation process. He further instructed the jurors that speculation as to what allegations gave rise to the dismissed charges was something to "put out of your mind and have no place in your deliberations or verdict."

The defendant's two experts reviewed the same records, but came to different conclusions. Dr. Plaud, who holds a Ph.D. in clinical psychology, did not find that the defendant suffered from a statutorily-defined personality disorder, although he conceded that the defendant could fulfill the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000) criteria for antisocial personality disorder. Based on his evaluation, Dr. Plaud concluded that the defendant would be at a "moderate" risk of reoffending. He also opined that the age range in which the defendant fell at the time of release (forty-six) was "starting to be associated with precipitously less recidivism, less reoffending, compared to men who are in their 20's."

The judge permitted the jurors to pose questions to the witnesses. See *Commonwealth* v. *Urena*, 417 Mass. 692, 701-703 (1994); *Commonwealth* v. *Britto*, 443 Mass. 596, 610-611 (2001).

---

[7]In a sidebar conference, the prosecutor told the judge that the witness had been instructed not to say "male victim." The defendant moved for a mistrial, but when the judge denied that motion, both defense counsel and the Commonwealth agreed that the judge should strike the answer but not give a curative instruction at that time, so as not to highlight the matter for the jury.

At the conclusion of Dr. Plaud's testimony, one question was, "[H]ow often do you find a person not to be sexually danger- ous?" In his answer, Dr. Plaud differentiated between different types of hearings, stating, "[I]t depends on which phase we're at. This phase is . . . Section 14, the trial, about 20 to 25 percent of the individuals that I evaluated I found to be sexually dangerous. In the Section 9's, it's about 55 percent . . . ." The judge then explained to the jury the difference between the procedures for G. L. c. 123A, § 9, and § 14.[8] Defense counsel renewed his earlier objection, arguing that this information was prejudicial to the defendant as it had the potential to lower the Commonwealth's burden.[9] The judge responded that he did not believe there was a "problem" with truthfully providing the jury with knowledge of the procedure, and he stated that he would emphasize the Commonwealth's burden during his charge to the jury.[10]

The defendant's second expert, psychiatrist Renee Sorrentino, concluded that the defendant met the diagnostic criteria of suf- fering from an antisocial personality disorder. However, Dr. Sorrentino testified that there was insufficient evidence, without interviewing the defendant, to reach a conclusion that he was likely to reoffend upon release, and therefore she could not definitively opine whether the defendant was sexually dangerous. On September 11, 2009, the jury found the defendant sexually dangerous.

*Discussion.* a. *Denial of motion for mistrial.* The defendant's first argument on appeal is that the judge erroneously denied his motion for a mistrial after Dr. Vaccher referred to the defend- ant's history of offending against both female and male victims

---

[8]Specifically, the judge informed the jury that "a person who has been placed in the Treatment Center is petitioning — he can petition on a yearly basis to be released. So that's what a Section 9 is."

[9]The defendant raised this same issue on another occasion, objecting when Dr. Feldman testified, as part of establishing her expertise, that she participated in the community access board, which is charged with deciding "whether individuals who have already been found to be sexually dangerous are still sexually dangerous." See G. L. c. 123A, § 1. The judge overruled that objection.

[10]During his final instructions, the judge repeatedly told the jury that it was the Commonwealth's burden to prove beyond a reasonable doubt that the defendant was sexually dangerous.

as a factor she considered in arriving at her opinion.[11] "The decision whether to declare a mistrial is within the discretion of the trial judge." *Commonwealth* v. *Bryant*, 447 Mass. 494, 503 (2006). Here, any prejudice that might have been caused by the inadmissible evidence was sufficiently remedied when the trial judge promptly struck the witness's entire answer and issued a curative instruction during his final charge, specifically addressing the issue of the defendant's prior sexual offense charges. See *Commonwealth* v. *Garrey*, 436 Mass. 422, 435 (2002) ("The judge's curative instructions were sufficient to remedy any possible prejudice to the defendant," after a witness testified that "the defendant said that 'he got away with it before' "). We presume that the jury followed the judge's instruction, and we see no abuse of discretion in the judge's decision not to declare a mistrial. See *Commonwealth* v. *Vallejo*, 455 Mass. 72, 84 (2009).

b. *Section 9 release procedure.* The defendant next argues that the trial judge impermissibly provided to the jury an explanation of the G. L. c. 123A, § 9, release process, that is, that the defendant could petition for release every twelve months; this explanation, he maintains, lowered the Commonwealth's burden of proof.

In *Miller, petitioner*, 71 Mass. App. Ct. 625, 626 (2008), the judge in a G. L. c. 123A, § 9, proceeding, as part of his preliminary and final instructions to the jury, "explain[ed] that the petitioner may annually file a petition for discharge from the treatment center." "The instructions flowed simply from the judge's apparent (and understandable) effort to give the jury some context for their responsibility in assessing the evidence . . . ." *Id.* at 627. The petitioner there argued that "the jury's knowledge that in another year another jury could consider his petition in the event he were not discharged would invite the jury to evade their responsibility to assess his current dangerousness and to take the easier route of settling on the status quo of continuing confinement." *Id.* at 631-632. Although we observed

---

[11]Underlying facts alleged in cases against a defendant that have been dismissed should not be admitted during the expert's direct examination. See *Commonwealth* v. *Markvart*, 437 Mass. 331, 338 (2002) ("Those details may be elicited during cross-examination, . . . but the decision whether to do so is a strategic one left to the opposing party").

that the "argument was built on subtle inference, not on direct command to the jury," *id.* at 632, we concluded that the instruction "introduced a *possible* extraneous factor into the jury's deliberations, albeit minimally. . . , and was best left omitted" (emphasis added).[12] *Id.* at 631.

This is a different situation. Here, brief explanations of the G. L. c. 123A, § 9, procedure were necessary to explain the witness's answers. Dr. Feldman's response, relating her participation in the community access board and its function, was an essential part of her testimony regarding her background and her expertise and, thus, permitted the jury to make an informed judgment about her credibility. See note 9, *supra.*

Similarly, the judge's explanation of the G. L. c. 123A, § 9, procedure was necessary to clarify Dr. Plaud's answer to the question of how often he found someone to be sexually dangerous, because his truthful response was dependent on the nature of the proceeding. In neither instance could the explanation reasonably have been omitted, and the evidence was more probative than prejudicial to the defendant.

In any event, based on the facts of this case, even if the explanations were given in error, they were not unduly prejudicial to the defendant in light of the trial judge's meticulous and oft-repeated instructions that the Commonwealth's burden was to prove beyond a reasonable doubt that the defendant was sexually dangerous. See *Miller, petitioner*, 71 Mass. App. Ct. at 632.

c. *Victim impact statement.* A victim impact statement from the victim in the governing offense was admitted over objection during Dr. Feldman's testimony, along with the police reports and grand jury minutes. The defendant argues this was error because the victim impact statement was prepared for sentencing and not for trial.[13]

General Laws c. 123A, § 14(*c*), inserted by St. 1999, c. 74,

---

[12]However, in light of all of the circumstances of that case, "even if the instruction were deemed error, there was no reversible error." *Miller, petitioner, supra* at 634.

[13]It is clear from the impact statement itself that it was prepared at the time of the original trial and not for the instant jury trial on the issue whether the defendant was sexually dangerous. See G. L. c. 258B, § 3(*p*). The victim wrote that she was a "widow 73 years old who live[d] alone" and that she had "live[d] in frightful terror since this happened." She also stated, "Rape,

§ 8, explicitly permits the introduction of "oral or written state-ments prepared for and to be offered at the trial by the victims of the person who is the subject of the petition." On one hand, the language of the statute appears to permit the admission of a victim impact statement, as the Commonwealth argues. On the other hand, we can see a meaningful distinction between a statement containing the facts of the underlying offense, facts that would be admitted in a jury trial, and the often emotional plea of a victim intended for the judge's ears at sentencing. On balance, we think the better practice, in most cases, would be to exclude the victim impact statement at the trial under G. L. c. 123A.

In this case, however, the statement was short. It added little to the otherwise considerable amount of evidence admitted describing the governing offense. In addition, the judge in-structed the jury during his final instructions not to base their verdict on "bias, prejudice, or sympathy as to any party," and we presume that the jury did as he instructed. See *Commonwealth* v. *Vallejo*, 455 Mass. at 84. Under all of the circumstances of this case, even if admitting the impact statement was error, we see no undue prejudice to the defendant.

d. *Interview with qualified examiners.* The qualified examiners testified that the defendant refused to participate in interviews with them. Each also testified explicitly that she had informed the defendant that it was his right not to speak with her. See *Commonwealth* v. *Lamb*, 365 Mass. 265, 270 (1974). The defend-ant's experts testified that they did not interview him. The defendant cross-examined each qualified examiner, Dr. Feldman in particular, using the fact that the examiner had not spoken with the defendant as a basis for illustrating what the examiner did not know about him and thus undermining her opinion. Both attorneys referred in their closing arguments to the fact that the defendant had chosen not to participate in interviews with the experts.

---

sodomy, continued rape and one's life being threatened in today's world [had] an added horror of also being given a death sentence because of the AIDS disease being transmitted to the victim. Months of worry have to go by before a true positive or negative test can be taken." The victim requested that the "jury" impose the sentence the defendant "deserves" to "prevent him from ever perpetrating such a crime on any one else."

The defendant objected to testimony from Dr. Feldman about his refusal to speak with her, although his objection apparently went not to the fact that the defendant had refused to speak with her, but to the fact that he did so on advice of counsel.[14] The judge overruled the objection. The defendant did not object when Dr. Vaccher testified that the defendant had refused to speak with her.

On appeal, the defendant argues for the first time that admitting evidence of the defendant's refusal to meet with the qualified examiners was prejudicial error, describing the situation as "analogous to the Fifth Amendment context." This argument fails for three reasons. First, this particular argument was not made to the trial judge and may not be made here for the first time. See *Smith* v. *Sex Offender Registry Bd.*, 65 Mass. App. Ct. 803, 810 (2006).

Second, to the extent that the defendant's argument about advice of counsel should have alerted the trial judge to the issue now pursued, the argument fails because this was a civil, not criminal, proceeding. See *Commonwealth* v. *Suave*, 460 Mass. 582, 587 (2011), citing *Commonwealth* v. *Bruno*, 432 Mass. 489, 499-502 (2000). Of course, "[w]hile commitment proceedings under c. 123A are civil proceedings, the potential deprivation of liberty to those persons subjected to these proceedings mandates that due process protections apply." *Johnstone, petitioner*, 453 Mass. 544, 549 (2009), quoting from *Commonwealth* v. *Bruno, supra.* However, those due process protections do not operate to make every constitutional right guaranteed in criminal proceedings applicable in commitment proceedings under c. 123A. For example, as the court noted in *Johnstone, petitioner*, in a § 9 proceeding, "[i]f the petitioner [seeking discharge] 'refuses, without good cause, to be personally interviewed by a qualified examiner appointed pursuant to this section,' then the petition may be dismissed on the Commonwealth's motion." *Id.* at 548-549, quoting from G. L. c. 123A, § 9.

Finally, it was an important part of the defendant's strategy to cross-examine the qualified examiners, pointing out the dif-

---

[14]Counsel argued: "[H]e wasn't interviewed by anybody. . . . I don't see how we get around that. But to get into . . . statements . . . where he says, 'I talked to my lawyer.' . . . I would like to stay away from [that]."

ficulty of assessing the defendant without ever speaking with him personally. Allowing this cross-examination, without permitting the witnesses to respond that the defendant had refused to speak with them, would have given the defendant an unfair advantage, permitting him to imply that the examiners were unprepared because of their own negligence, or even bias. Cf. *Commonwealth* v. *Connors*, 447 Mass. 313, 319 (2006).[15] Under all of the circumstances of this case, we see no error in permitting the qualified examiners to testify that the defendant refused to speak with them on advice of counsel.

e. *Prior sexual offense charges: ineffective assistance of counsel.* The defendant next argues that his trial counsel was ineffective because evidence that the defendant had been charged with, but not convicted of, other sexual offenses was admitted without objection.[16] The statute provides that "[j]uvenile and adult court probation records . . . shall be admissible at trial." G. L. c. 123A, § 14(c). Such records necessarily include records of prior offenses that may have been dismissed or nol prossed. *Commonwealth* v. *Markvart*, 437 Mass. 331, 336 (2002), on which the defendant relies, provides only that "police reports and witness statements" from nol prossed cases may not be admitted directly. Nothing in that case indicates that the fact that the defendant was charged with other offenses should be kept from the jury. "We have long recognized that the admissibility of

---

[15]In *Connors,* the court stated, "We agree with the defendant that he had the right, pursuant to G. L. c. 233, § 20B, to refuse to speak to the qualified examiners who attempted to interview him. . . . However, the defendant cannot selectively invoke this privilege as to the court-appointed experts, and not as to his own expert. Where a defendant voluntarily seeks to present expert psychiatric evidence, which includes his own statements, the defendant is not denied his privileges against self-incrimination if he is required to submit to an examination by the Commonwealth's psychiatrist as a condition of the admission of his evidence." 447 Mass. at 319.

[16]The defendant raises this claim based solely on the trial record. "Such an ineffective assistance claim is in its 'weakest form' because 'it is bereft of any explanation by trial counsel for his actions and suggestive of strategy contrived by a defendant viewing the case with hindsight.' " *Commonwealth* v. *Diaz,* 448 Mass. 286, 289 (2007), quoting from *Commonwealth* v. *Peloquin,* 437 Mass. 204, 210 n.5 (2002). "[T]he preferred method for raising a claim of ineffective assistance of counsel is through a motion for a new trial," where an appropriate factual record can be developed. *Commonwealth* v. *Zinser,* 446 Mass. 807, 810 (2006). We address the argument because we see no error. See *id.* at 811.

the various records and reports in sexually dangerous person proceedings represents ' "a very radical departure" from ordinary evidentiary rules,' *Andrews, petitioner*, 368 Mass. 468, 473 (1975), quoting *Commonwealth* v. *McGruder*, 348 Mass. 712, 715 (1965), cert. denied, 383 U.S. 972 (1966); but we have repeatedly applied the evidentiary rules prescribed by the Legislature for such proceedings." *McHoul, petitioner*, 445 Mass. 143, 147 (2005), cert. denied, 547 U.S. 1114 (2006). See generally Mass. G. Evid. § 1103 (2011). In *McHoul*, the court specifically noted, "Other records made admissible by these statutory sections are records kept by the courts or other public agencies and officials." *Id.* at 152.

In addition, in this case, defense counsel's motion in limine to exclude substantive detail from offenses that were dismissed was agreed to by the Commonwealth. Although the qualified examiners were permitted to refer to prior charges as information relied upon as part of their evaluations, they also made it clear that the charges had been dismissed. Moreover, the reports and exhibits admitted during the trial were carefully redacted to exclude details from these previously dismissed cases.

Finally, the judge specifically told the jury during his final instructions that they "must not speculate about what the charge or charges were, why they were dismissed, or what allegations gave rise to them." As we see no error in admitting the evidence, trial counsel's failure to object cannot be characterized as ineffective assistance of counsel.

f. *Antisocial personality disorder.* The defendant's final contention is that his "commitment based on a diagnosis of antisocial personality disorder violated his rights to due process under the Fourteenth Amendment [to the United States Constitution] and art. 12 of the Massachusetts Declaration of Rights." We disagree. It is not the diagnosis alone that supported the finding that the defendant was sexually dangerous, but the diagnosis, combined with other evidence, that his personality disorder made him "likely to engage in sexual offenses if not confined to a secure facility." G. L. c. 123A, § 1, as amended by St. 1999, c. 74, § 6. See *Commonwealth* v. *Reese*, 438 Mass. 519, 526 n.9 (2003) ("diagnosis [of antisocial personality disorder] is adequate to satisfy the definitional requirements of a sexually dangerous

person in G. L. c. 123A, § 1"). See also *Young* v. *Murphy*, 615 F.3d 59, 65 (1st Cir. 2010), in which the United States Court of Appeals for the First Circuit noted that "[t]he Massachusetts Court of Appeals declined to adopt this [constitutional] argument in the abstract way in [*Commonwealth* v. *Young*, 66 Mass. App. Ct. 1103 (2006),] and instead disposed of the case by examining the evidentiary record to determine whether sufficient evidence was produced at trial to demonstrate that [the defendant's antisocial personality disorder] seriously impairs his ability to control his sexual impulses. . . . We hold that the state court's analytical choice represents a reasonable application of Supreme Court precedent." Similarly, in this case, we are satisfied that there was ample evidence to support the jury's verdict that the defendant was a sexually dangerous person.[17]

*Judgment affirmed.*

---

[17]We also conclude that the defendant received a fair trial and that any errors that may have occurred during the trial were sufficiently cured by the trial judge's careful instructions. There is no need to address further the defendant's catch-all claim that a combination of errors deprived him of a fair trial.