## Commonwealth vs. Albano Amaral.

Bristol.  December 6, 1982. — May 16, 1983.

Present: Hennessey, C.J., Abrams, Nolan, Lynch, & O'Connor, JJ.

*Homicide. Practice, Criminal,* Instructions to jury. *Insanity. Malice. Evidence,* Sanity.

At a murder trial, the judge did not err in refusing to instruct the jury with respect to voluntary manslaughter since no view of the evidence, including a consideration whether certain incidents immediately preceding the killing constituted reasonable provocation, would warrant a verdict of voluntary manslaughter. [187-189]

At a murder trial, the judge did not err in refusing to instruct the jury that, in determining the adequacy of the provocation suffered by the defendant, they should take into account his mental state at the time of the killing. [189-190]

At a murder trial, evidence of the defendant's criminal responsibility, including essential agreement by expert witnesses that the defendant suffered from a mental disease or defect at the time of the killing but disagreement whether the defendant was criminally responsible, was sufficient, together with the testimony of lay witnesses and other evidence of the defendant's criminal responsibility, to sustain the Commonwealth's burden of proving that the defendant was criminally responsible. [190-193]

Where it did not appear that the Commonwealth's psychiatric witness at a murder trial had based his direct testimony on a misapprehension of the law, and where the judge charged the jury on the correct standard for determining criminal responsibility, the witness's use of the phrase "incapable of" instead of "lacks substantial capacity" in stating on cross-examination the test for criminal responsibility as established in *Commonwealth* v. *McHoul,* 352 Mass. 544, 547 (1967), did not vitiate his earlier testimony regarding the defendant's criminal responsibility as having been based on a stricter test than the law allows. [193-194]

Statements made in the presence of the jury by the judge, the prosecutor, and defense counsel during a murder trial, which the defendant alleged to have been incomplete or otherwise inaccurate statements of law concerning his criminal responsibility, when examined in their immediate contexts and in the context of the entire case, and especially in light of the jury instructions as a whole, created no substantial likelihood of a miscarriage of justice. [194-195]

INDICTMENT found and returned in the Superior Court Department on September 12, 1980.

The case was tried before *Hallisey*, J.

*Brian J. Sullivan* for the defendant.

*Patricia O. Ellis*, Assistant District Attorney (*Alvin Youman*, Assistant District Attorney, with her) for the Commonwealth.

NOLAN, J. The defendant, Albano Amaral, was convicted of murder in the first degree on June 25, 1981, after a jury trial in which he presented his lack of criminal responsibility as a defense. He was sentenced to the Massachusetts Correctional Institution, Walpole, for a term of life imprisonment. The trial judge denied the defendant's motions to set aside the verdict, and for a new trial; the defendant appeals and, pursuant to G. L. c. 278, § 33E, he seeks relief. The defendant raises three principal issues: (1) that the trial judge erred in failing to give a charge on manslaughter, (2) that the Commonwealth failed to meet its burden of proving that the defendant was criminally responsible and that, consequently, the jury's verdict was against the weight of the evidence, and (3) that certain alleged misstatements of law made at trial by the prosecutor, defense counsel, and the judge misled the jury as to the proper test of criminal responsibility. The defendant also argues that, under G. L. c. 278, § 33E, we should order a new trial or reduce the verdict of murder in the first degree to manslaughter. We affirm the conviction and leave the verdict undisturbed.

On the evidence, the jury were warranted in finding the following. At approximately 7:30 P.M. on August 27, 1980, the victim, Jorge Pedro, and his uncle, Manuel Luz, were standing in front of the Portuguese Citizens Club, also known as the "Z Club" (club), on County Street in New Bedford. The defendant approached the two men and inquired whether the café next door to the club was open. Luz answered that he did not know. The victim then began pushing the defendant, who responded by asking, "Are we friends or what?" The victim replied, "No, I want to have a fight with you." Several such exchanges occurred. The

defendant then said that he was going into the café. Instead, he returned to his car, which was parked on County Street north of the club. The defendant drove north a short distance to a parking lot where he turned around and headed south on County Street toward the club. As he drove, the defendant took his rifle from the back seat[1] and placed it on the front seat next to him.

During this time, the victim and Luz remained in front of the club. Luz warned the victim not to have anything to do with the defendant. The victim answered that he was only playing and that when the defendant returned he was going to pretend to throw a bag of beer at him.

Two or three minutes after the shoving incident, the defendant pulled up his car across the street from the club. The victim picked up an empty bag, walked toward the car, and made a motion as if to throw the bag at it. The defendant positioned his rifle out the window of the car and fired some twelve shots. The victim was struck by four or five of these shots as he ran zig-zag fashion toward the door of the club, where he eventually fell. After the shooting, the defendant looked over at Luz, who said, "It's nothing to do with me." The defendant then drove off quickly and went home, where he ate, washed, and went to bed.

Acting on the description provided by witnesses, three New Bedford police officers visited the defendant at his place of employment the following day. The officers advised the defendant of his Miranda rights[2] and told him that they were investigating a shooting. They asked him whether he owned a Chevrolet Nova automobile. The defendant answered that he did and he agreed to accompany the police officers to the police station to pursue the matter.

---

[1] A police officer testified that the defendant had stated that he had been target shooting on the day before the incident and that he had put the rifle in the trunk of the car. On the day of the incident, however, he put the rifle in the back seat to remind himself to take it into his house when he got home.

[2] The defendant does not challenge the propriety of any questioning or the admissibility of any statements that he made while being questioned.

After again being advised of his rights, the defendant gave an alibi statement. He denied owning a firearm, but when the police confronted him with their knowledge that he owned a .22 caliber rifle, the defendant gave a statement which essentially corroborated Luz's description of the events and added some of the details mentioned above. The defendant also stated that shortly after he purchased the gun in late June, 1980, the victim approached him as he was showing the gun to a third person. The victim punched the defendant and pushed the gun. A police officer typed the statement.

While going over the first typewritten statement, the defendant told the police of a second incident where the victim had come upon him as he showed the gun to another person, and, according to the defendant, the victim kicked the rifle, punched the defendant, and told the defendant that he was going to attack him and that he hoped someone would steal the rifle. The defendant stated that he had been treated by a Dr. Ambadgis in 1974, and that the doctor had given him "mind pills" for the "pictures in his mind." He said that he had stopped seeing Dr. Ambadgis in 1979, and had stopped taking the pills in 1980. The defendant stated that he was currently under treatment by a Dr. Sousa for a stomach ailment. A police officer retyped the statement to incorporate the new information. On review, the defendant indicated that Dr. Sousa was treating him for nervousness. He wrote the word "nerves" next to the reference to Dr. Sousa's treatment and then initialed the correction.

1. *The failure to give a manslaughter instruction.* The trial judge refused the defendant's request for an instruction on voluntary manslaughter because he believed it was not warranted on the evidence. Defense counsel objected to this refusal and, referring to *Commonwealth v. Gould*, 380 Mass. 672 (1980), suggested that the jury should be allowed to consider the defendant's mental state at the time of the killing to determine whether it was murder or manslaughter.

The judge refused to give such an instruction.[3] We consider first the defendant's contention that the evidence supported a traditional voluntary manslaughter instruction.[4]

"Whenever death ensues from sudden transport of passion or heat of blood, if upon a reasonable provocation and without malice, or if upon sudden combat, it will be manslaughter; if without such provocation, or the blood has had reasonable time or opportunity to cool, or there be evidence of express malice, it will be murder." *Commonwealth* v. *Webster*, 5 Cush. 295, 307 (1850). In order for a jury to find that a "defendant formed an intent to kill in a transport of passion or in the heat of blood, . . . [t]here must be evidence that would warrant a reasonable doubt that something happened which would have been likely to produce in an ordinary person such a state of passion, anger, fear, fright, or nervous excitement as would eclipse his capacity for reflection or restraint, and that what happened actually did produce such a state of mind in the defendant." *Commonwealth* v. *Walden*, 380 Mass. 724, 727-728 (1980). If any view of the evidence would permit a finding of manslaughter, rather than murder, the judge should instruct the jury on the elements of manslaughter. *Id.* at 726. We consider only whether the incidents immediately preceding the killing constituted reasonable provocation. Any history of prior hostilities between the victim and the defendant can only be viewed as a cause of the incidents preceding the killing and not as an element of the provocation. Cf. *Commonwealth* v. *Jones*, 366 Mass. 805, 807-808 (1975) (earlier arguments precipitated violent quarrel and fatal attack).

---

[3] We hold the defendant to his choice of instructions at trial and we therefore need not consider whether a charge on involuntary manslaughter would have been warranted.

[4] At trial the defendant requested traditional voluntary manslaughter language in the instructions. *Commonwealth* v. *Kendrick*, 351 Mass. 203, 212 (1966). The judge denied the request because he believed the facts did not warrant such an instruction. Although the defendant's brief is unclear on this issue, we read it as treating the issue sufficiently for purpose of appeal.

Even if we assume that the shoving incident minutes before the shooting could create reasonable provocation, any threat to the defendant stemming from the shoving incident disappeared when the defendant left the scene. See *Commonwealth* v. *Walden, supra* at 728 (threat of harm to defendant from combat ended when victim was knocked to the ground). Cf. *Commonwealth* v. *Stillwell,* 366 Mass. 1, 4-6 (1974), cert. denied, 419 U.S. 1115 (1975), new trial granted on another ground, 387 Mass. 730 (1982). Without evidence of a threat of an "immediate and intense offense," *Commonwealth* v. *Bermudez,* 370 Mass. 438, 442 (1976), instructions on manslaughter would not be appropriate. It is evident that the victim's gesture with the bag could not, by itself, present reasonable provocation.[5] There is no error in the judge's denial of traditional voluntary manslaughter instructions.

The defendant next argues that the jury should have been allowed to consider his mental state at the time of the killing to determine whether the killing was murder or manslaughter. More particularly, the defendant urges that "evidence of mental illness should be allowed to be considered as to whether the Defendant was provoked during the pushing and shoving incident and whether such provocation continued until he shot the victim." He views his argument as a logical extension of our holding in *Commonwealth* v. *Gould,* 380 Mass. 672 (1980), where we concluded that the jury should be allowed to consider evidence of a defendant's mental illness in determining whether he acted with deliberate premeditation or with extreme atrocity or cruelty. Essentially, the defendant's argument is that the adequacy of the provocation and the cooling period should be determined by a subjective standard.[6] In making this argument,

---

[5] There is no evidence that the defendant believed or reasonably feared that the bag contained any substance which might pose a threat to him if the bag were thrown near or against his car. Indeed, the victim never threw the bag.

[6] At trial, there were no questions directed to the experts as to whether the defendant's mental impairment affected his response to the acts alleged as "provocation." Thus, there is no evidentiary support for the defendant's claim.

the defendant ignores the fact that subsequent to the *Gould* case we declined to adopt a subjective test of malice. "Malice aforethought simply does not require any actual intent to kill or to do grievous bodily harm, or any *foresight of such consequences, if the jury thought them obvious in the circumstances known to the defendant*" (emphasis supplied). *Commonwealth* v. *Starling,* 382 Mass. 423, 428 (1981). *Commonwealth* v. *Swift,* 382 Mass. 78, 83 (1980). Since malice does not require any actual or subjective intent to kill or to inflict grievous bodily harm, there is no basis in our law for the defendant's suggestion that provocation should be viewed subjectively. There is no error in denying the defendant's request that the jurors be instructed that provocation should be viewed subjectively.

2. *The sufficiency of the evidence on criminal responsibility.* The defendant contends that the Commonwealth's evidence on the defendant's criminal responsibility was insufficient to support the jury's verdict because the evidence was defective both in quality and quantity. He asserts that the opinion of the Commonwealth's expert was based on insufficient information as well as a misunderstanding of the law. He further argues that this opinion, when viewed against the testimony of the three experts presented by the defense, was not enough to sustain the Commonwealth's burden.[7]

a. *The quantity of the evidence.* Before we analyze the expert testimony on the defendant's sanity, we note that a jury may consider without the aid of an expert the fact "that a great majority of men are sane," and "the probability that any particular man is sane." *Commonwealth* v. *Clark,* 292 Mass. 409, 415 (1935). We have said that these facts may form the basis for the inference of sanity which this court has recognized as an appropriate foundation for a jury's

────────────────────

[7] The sufficiency of the evidence was not challenged at trial. We believe, however, that the Commonwealth's evidence of the defendant's criminal responsibility was sufficient as a matter of law and we assume that the issue is properly before us. See *Commonwealth* v. *Shelley,* 381 Mass. 340, 345-346 (1980).

finding of sanity. See *Commonwealth* v. *Kostka*, 370 Mass. 516, 530-531 (1976).

However, this is not a case where the Commonwealth relied solely upon an inference of sanity in the face of overwhelming evidence of the defendant's insanity. See *Commonwealth* v. *Mutina*, 366 Mass. 810, 811 (1975); *Commonwealth* v. *Cox*, 327 Mass. 609, 615 (1951). The Commonwealth's expert, Dr. Jay Kuten, a psychiatrist, testified on direct examination that, although the defendant exhibited some signs of mental illness, the symptoms were not characteristic of any discrete, recognizable mental disease. He further testified that the question of mental illness was equivocal, but that the defendant might possibly have suffered from a mental disease or defect on the day of the shooting.[8] However, in reference to questions phrased in the appropriate language of *Commonwealth* v. *McHoul*, 352 Mass. 544 (1967), he gave his opinion that the defendant nevertheless was criminally responsible at the time of the shooting.

Dr. Kuten had formed his opinion on the basis of the following: two interviews he had with the defendant after the shooting;[9] the results of three psychological tests administered to the defendant; interviews with Dr. Ambadgis, the defendant's sister, and his work supervisor; a letter from Dr. Ambadgis; a letter from an assistant district attorney; a competency and criminal responsibility evaluation prepared by a Dr. Nagler, who later testified for the defense; police reports of the shooting; the defendant's confession; and a one-page summary of a hospital record from Taunton State Hospital, where the defendant had been treated in 1974.

---

[8] On cross-examination, Dr. Kuten stated that it was not possible for him to determine whether the defendant suffered from a particular mental disorder but that there was a "high probability that he does and did."

[9] The first interview occurred in October, 1980, and lasted about three hours. At the second interview, in January, 1981, Dr. Kuten was assisted by a Portuguese-speaking psychologist who, in December, 1980, had administered the tests referred to above. Dr. Kuten testified that at the first interview he had experienced a slight communication problem with the defendant, whose native language is Portuguese. The second interview lasted two hours.

The defendant claims that Dr. Kuten's opinion was defective because he did not consider all relevant information in forming it.[10] The weakness of the expert's opinion may be explored by cross-examination.[11] If the jurors then conclude that an expert did not conduct a proper or thorough examination of the defendant, or that he relied on incredible, insufficient or otherwise improper information in forming his opinion, they are free to disregard that expert's testimony. See *Commonwealth* v. *Kostka,* 370 Mass. 516, 535-536 (1976), and cases cited. "The jury are . . . the sole judges of the credibility and weight of all of the evidence on the issue of insanity." *Commonwealth* v. *Smith,* 357 Mass. 168, 178 (1970). That the jurors apparently chose to rely on the Commonwealth's expert in this case is not a matter that can be disturbed by this court.

Further, the jury had the right to infer mental competency from the evidence of the defendant's activity before and after the crime. See *Commonwealth* v. *Francis,* 355 Mass. 108, 111 (1969). Although the expert witnesses essentially agreed that the defendant suffered from a mental disease or defect at the time of the shooting, there was disagreement whether the defendant was criminally responsible. Dr. Kuten's testimony, together with the testimony of the lay witnesses and the other evidence of the defendant's criminal responsibility,

[10] The defendant gives as examples the fact that Dr. Kuten relied on a summary of the Taunton State Hospital report rather than on the forty-two page document itself, which apparently discussed hallucinations experienced by the defendant in 1974, among other things. However, Dr. Kuten testified that he did examine the complete report prior to trial. The defendant also finds fault with the length of the doctor's interview with the defendant's sister (ten minutes) and the doctor's failure to "get all the particulars" concerning an arrest of the defendant in January, 1981, for an apparently unrelated incident.

[11] When direct examination of Dr. Kuten began, the judge told the jurors they should evaluate the testimony of any expert on the basis of his observation, memory, possible bias, training, experience, and the basis on which he formed his opinion. Just after cross-examination began, the judge informed the jurors that "cross examination has a wide range, can probe the bases of the doctor's testimony in an attempt to show some weaknesses or inconsistencies. That's what we are doing now."

was sufficient to sustain the Commonwealth's burden. The jury need not have believed the defendant's evidence. See *Commonwealth* v. *Strother*, 375 Mass. 462, 470-471 (1978).[12]

b. *The quality of the evidence.* When asked on cross-examination to state his understanding of the Massachusetts law on criminal responsibility, Dr. Kuten replied that "a person is to be held as not responsible in the criminal sense if on the basis of mental illness or defect, he is incapable of appreciating the criminality or wrongfulness of his actions or incapable of conforming his conduct to the requirements of the law." The defendant argues that the doctor's use of the phrase "incapable of" instead of "lacks substantial capacity," the phrase used in *Commonwealth* v. *McHoul*, 352 Mass. 544, 547 (1967), indicates that the doctor based his opinion of the defendant's criminal responsibility on an improper standard[13] with the result that the jury "could not and should not have concluded that Dr. Kuten's opinion was in accordance with the test of criminal responsibility."

In *Commonwealth* v. *Shelley*, 381 Mass. 340, 348 n.4 (1980), we noted that an expert need not phrase his opinion in the terms of the *McHoul* test but that, if reference to a legal standard was to be made, "counsel properly would be required to ask the expert to cast his opinion in terms of the legal standard set out in *McHoul*." In the present case, Dr. Kuten accomplished this result in his response to the prosecutor's questions on direct examination. We think that his responses to these questions did not mask an underlying misapprehension of the law. In further questioning

---

[12] The defendant argues in his brief that the jury's verdict was against the weight of the evidence because based on insufficient evidence of criminal responsibility. We reject the argument, phrased in this manner, because we find that the evidence is sufficient. The defendant does not argue that the verdict is otherwise against the weight of the evidence. We have examined this issue pursuant to G. L. c. 278, § 33E, and we see no reason to disturb the verdict.

[13] Dr. Kuten had used the same phrase in his report on the defendant's criminal responsibility. The doctor referred to the report at trial, but it does not appear that the report was entered in evidence.

Dr. Kuten concerning his understanding of the law, defense counsel called attention to the doctor's use of the phrase "incapable of." He asked Dr. Kuten whether he distinguished "between lacking substantial capacity and incapable," and the witness replied in the negative.[14] We think the doctor's explanation, viewed in light of the judge's proper charge on the issue of criminal responsibility and Dr. Kuten's earlier testimony, eliminated any danger that the jury were allowed *to consider insufficient or otherwise improper* evidence of the defendant's criminal responsibility. See *Commonwealth* v. *Smith*, 357 Mass. 168, 177-180 (1970). Compare *Commonwealth* v. *Westmoreland*, 388 Mass. 269, 280 (1983).

3. *The alleged misstatements.* The defendant contends that during trial the judge, the prosecutor, and his own trial counsel made certain incomplete or otherwise inaccurate statements of law concerning criminal responsibility which either confused the jury as to the proper standard or caused them to deliberate upon an improper standard. Because the defendant neither objected to the alleged misstatements nor requested curative instructions, we consider these statements under the broad power of review provided by G. L. c. 278, § 33E. *Commonwealth* v. *Cole*, 380 Mass. 30, 38-39 (1980).

The trial judge gave a complete and proper charge to the jury on the issue of criminal responsibility. He made more than one reference to the standard by which criminal responsibility was to be judged, and he made numerous references to the Commonwealth's burden of proving all ele-

---

[14] At side bar, defense counsel asked the judge to instruct the jury to disregard the doctor's testimony about the defendant's criminal responsibility because it was based on a stricter standard than the law required. The judge refused, noting that, since the witness had stated that he considered "incapable as the equivalent of lacking substantial capacity," the jury should determine as a matter of fact in which sense the doctor had used the term. Defense counsel objected to the judge's refusal. We see no error in the judge's handling of this matter.

ments of the crime charged.[15]   The defendant asserts, however, that the damage had already been done and that the misstatements were never corrected.   The defendant compares this case to *Commonwealth* v. *Killelea*, 370 Mass. 638 (1976), where we reversed a murder conviction because the prosecutor's repeated and "grossly improper" statements, *id.* at 648, as to the consequences of a jury verdict of not guilty by reason of insanity were not corrected by the judge's efforts at curative instructions.   While the judge's instructions here were not intended as curative, his instructions fully and fairly stated the law on the subject of criminal responsibility in accordance with *Commonwealth* v. *McHoul*, 352 Mass. 544 (1967), and were sufficient to correct any misapprehensions the jury may have had as a result of the alleged misstatements.[16]   Indeed, the statements challenged here were hardly "grossly improper" comments. We have examined these statements both in their immediate contexts and in the context of the entire case, and especially in the light of the jury instructions as a whole, and we conclude that, individually or together, they created no substantial likelihood of a miscarriage of justice.

4. *Consideration under G. L. c. 278, § 33E.*   We have examined the entire record and we do not feel compelled to disturb the verdict or to order a new trial.   In this connection, we have paid special attention to the problems related to the application of the protocol established by us in *Blaisdell* v. *Commonwealth*, 372 Mass. 753 (1977), and by the provisions of G. L. c. 233, § 23B, as they pertain to Dr. Kuten's interviews with the defendant and his testimony

---

[15] In his initial explanation of the test of criminal responsibility, the judge inadvertently placed the burden on this issue on the defendant. In subsequent references to the test, he correctly placed the burden on the Commonwealth.   At the close of his instructions, the judge was informed of his original error and he corrected it with further instructions to the satisfaction of the prosecutor and defense counsel.

[16] It appears that a "chalk" which set forth the elements of the *McHoul* test was visible to the jurors during at least some parts of defense counsel's closing argument and the judge's instructions to the jury.

concerning statements made by the defendant during these interviews. We see no grounds for relief under G. L. c. 278, § 33E.

*Judgment affirmed.*