# United States Court of Appeals
## For the First Circuit

No. 16-2167

EBER RIVERA,

Petitioner, Appellant,

v.

MICHAEL A. THOMPSON, Superintendent,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Indira Talwani, U.S. District Judge]

Before

Howard, Chief Judge,
Selya and Lipez, Circuit Judges.

Benjamin Brooks, with whom Good Schneider Cormier & Fried was on brief, for appellant.
Todd Michael Bloom, Assistant Attorney General, with whom Maura Healey, Attorney General of Massachusetts, was on brief, for appellee.

January 9, 2018

**LIPEZ**, **Circuit Judge**.  Eber Rivera appeals from the district court's denial of his petition for a writ of habeas corpus under 28 U.S.C. § 2254.  Rivera was convicted in Massachusetts state court after a jury trial on charges arising from the stabbing of Robert Williams during an altercation between the two men.  Rivera contends that his Sixth Amendment right to the effective assistance of counsel was violated when his trial counsel: (1) did not move to suppress inculpatory statements he made in response to questions from a police officer while in custody; and (2) failed to introduce at trial evidence promised in her opening statement that a third party committed the stabbing.  Because we conclude that trial counsel's failure to move to suppress Rivera's statements to the police officer constituted ineffective assistance of counsel under clearly established law, we reverse and remand with instructions to grant the writ.  We do not reach the other ground on which Rivera bases his Sixth Amendment claim.

**I.**

**A. Factual Background**

Rivera was indicted by a grand jury in Middlesex County, Massachusetts, for armed assault with intent to murder (count I), assault and battery by means of a dangerous weapon causing serious bodily injury (count II), and assault and battery upon a public employee (count III).  See Mass. Gen. Laws ch. 265, §§ 13D, 15, 15A(b).  The first two charges stemmed from a fight in the early

- 2 -

morning of December 16, 2007, during which Williams was stabbed. The third stemmed from an altercation with a police officer at the police station after Rivera was arrested.

At the six-day trial, the jury was presented with the following testimony. Rivera, Williams, Ana Reyes, Josue Gonzalez, and Robert Zonghi were gathered at Reyes' apartment drinking, talking, and playing dominos. Gonzalez testified that he left the room where Rivera and Williams were sitting for a few minutes. When he returned, the atmosphere in the room had changed. He speculated that "[a]t some point something happened that kind of triggered [Rivera]," who soon walked outside followed by Williams. Gonzalez then saw through the window that Rivera and Williams were engaged in a fist fight, but he did not see who initiated it. Rivera's attempts to hit Williams were unsuccessful, and Williams, who was bigger, quickly gained the upper hand. Gonzalez saw that Williams had pinned Rivera to the ground and was punching him, with Rivera in a position where he "couldn't do nothing." At that point, "everybody went outside" to attempt to break up the fight. Gonzalez did not see what happened next, but he heard Williams say "I think he stabbed me," and saw him fall forward onto Rivera. Gonzalez testified that he initially did not believe that Williams had been stabbed because he did not remember Rivera having a knife, and he did not see a knife during the altercation.

Gonzalez and Zonghi brought Williams inside the apartment. Zonghi testified that, by the time he came outside, Williams was on the ground bleeding. Reyes testified that she did not see what happened during the fight, but that she did see Gonzalez and Zonghi helping Williams, who was bleeding from the stomach and face, into the apartment. It was later determined that Williams had been stabbed in the head, abdomen, and chest, causing damage to his heart and liver and significant internal bleeding and blood loss. Gonzalez and Reyes both testified that they did not see Rivera following the stabbing.

After bringing Williams inside, Gonzalez called 911, and Framingham Police Officer Arthur Sistrand, who was nearby, responded to the call. Sistrand testified that he turned onto the street where the altercation happened within thirty or forty seconds of receiving the call, and he saw Rivera jogging across the street away from the address where the stabbing had been reported. Sistrand, who was in uniform, got out of his marked police cruiser and ordered Rivera to stop, but Rivera continued jogging on the sidewalk. Sistrand then drew his gun and ordered Rivera to get on the ground. Rivera complied, laying in the street in a prone position. Sistrand testified that he noticed that Rivera's right hand was bleeding and called for backup.

With Rivera still on the ground and Sistrand's gun still drawn, Sistrand asked Rivera what he was doing. Rivera responded

- 4 -

that he "had a beef with a nigger." Sistrand then asked him why, and Rivera responded that he had been "disrespected." Sistrand asked Rivera for his name, but Rivera declined to give it, stating that he was "too out of breath and too cold to respond." About thirty seconds later, Sistrand asked Rivera how he had hurt his hand, and Rivera said that he had cut it on a ring. After that, Rivera "stated that he was cold, and he wasn't answering any more of [Sistrand's] questions." Backup soon arrived and Rivera was handcuffed and taken to the police station.

During booking at the police station, Sergeant Scott Brown asked Rivera to remove his clothing that had blood on it so that it could be processed as evidence. Rivera refused and became combative, yelling at Brown and using racial slurs toward him. When Brown tried to remove Rivera's sneaker, Rivera slapped his hand away. Brown eventually removed Rivera's clothes, and DNA testing later revealed that blood on Rivera's jeans belonged to Williams.

At trial, the Commonwealth's theory of the case was straightforward. It contended that Williams said something that offended Rivera, leading Rivera to engage Williams in a fistfight with the intent to stab and murder him. Rivera's counsel conceded that Rivera had a fight with Williams, but argued that none of the witnesses actually saw how the fight started or how the stabbing occurred, and thus the prosecution had not proved beyond a

- 5 -

reasonable doubt that Rivera committed the stabbing and that any force used by Rivera was not in self-defense. She promised in her opening statement that the jury would hear testimony that there were two other people involved in an argument with Williams, including "Mr. Ruiz," and that the jury was "going to hear testimony that a Mr. Ruiz had a bat, and he was also wielding a knife."[1] Despite these promises, however, she did not elicit any testimony that someone named Ruiz was present during the events in question, nor did she elicit testimony that anyone present at the scene of the altercation had a knife or a baseball bat. In her closing argument, however, she again mentioned the presence of "Mr. Ruiz," stating that "Mr. Rivera was present in the same way that Mr. Gonzalez was, in the same way Mr. Zonghi was, in the same way Mr. Ruiz was, in the same way Ms. Reyes was."

The jury found Rivera guilty of all three counts. He was sentenced to nine to ten years in state prison for count II (assault with a dangerous weapon), followed by five years of supervised probation for counts I (armed assault with intent to murder) and III (assault on a public employee).[2]

_____

[1] Counsel apparently intended to refer to Luis Diaz (a.k.a. Frankie Alvarez), who was reported to be at the scene by several of the trial witnesses when they initially spoke to police. Evidently having trouble keeping the names of the men straight, she also referred at one point to Rivera as "Mr. Gonzalez."

[2] The Commonwealth recommended that the court sentence Rivera to between ten and twelve years' imprisonment on the armed assault with intent to murder charge and five years of probation on the

## B. Procedural History

Rivera appealed from his conviction.  While the appeal was pending, he filed a motion for a new trial pursuant to Massachusetts Rule of Criminal Procedure 30, claiming that he had received ineffective assistance of counsel because, among other errors, his attorney had not moved to suppress his statements to Sistrand and had failed to introduce the promised evidence that "Mr. Ruiz" was at the scene of the stabbing wielding a knife.  The Massachusetts Superior Court denied the motion without a hearing and without findings of fact or conclusions of law.

After Rivera appealed that decision, it was consolidated with his direct appeal.  The Massachusetts Appeals Court denied the appeals in a summary decision.  See Commonwealth v. Rivera, 966 N.E.2d 867 (Table), No. 10-P-1321, 2012 WL 1623373, at *1 (Mass. App. Ct. May 10, 2012).  With respect to trial counsel's failure to move to suppress the statements that Rivera made to Sistrand, the court said only that "it was not ineffective assistance for counsel to not move to suppress the defendant's initial statements to the police where the questions did not constitute interrogation for the purposes of Miranda warnings."

---

other two counts, to run concurrently.  The court chose to instead impose the total term of imprisonment on count II (assault and battery with a dangerous weapon) and sentence Rivera to probation on counts I and III because the possible jail time in the event that Rivera violated probation on count I (armed assault with intent to murder) was higher than it would be for count II.

Id. at *1. Similarly, the court in one sentence disposed of the claim that counsel was ineffective because she failed to introduce promised evidence, finding that it "was a matter of tactics based on how the Commonwealth's evidence unfolded and the lack of corroboration for the third party's involvement." Id. The court then concluded that, "[f]or these reasons, and for the reasons included in the Commonwealth's brief at 13-39, the defendant was not deprived of the effective assistance of counsel." Id. The Massachusetts Supreme Judicial Court denied Rivera's petition for further appellate review. See Commonwealth v. Rivera, 972 N.E.2d 23 (Table) (Mass. 2013).

In his petition to the district court for a writ of habeas corpus, Rivera again argued that he was deprived of effective assistance of counsel because trial counsel failed to seek the suppression of his statements to Sistrand and because she did not introduce the promised evidence of a third-party culprit at the scene of the stabbing. The district court denied the petition, see Rivera v. Thompson, No. 13-11789-IT, 2016 WL 4273180 (D. Mass. Aug. 12, 2016), but granted a certificate of appealability pursuant to 28 U.S.C. § 2253(c). Rivera timely filed this appeal.

## II.

## A.   Ineffective Assistance of Counsel Standard

To prevail on an ineffective assistance of counsel claim, Rivera must show both that his "counsel's representation fell below an objective standard of reasonableness" (the performance prong), and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (the prejudice prong). Strickland v. Washington, 466 U.S. 668, 688, 694 (1984).

With respect to the performance prong, we inquire "whether counsel's assistance was reasonable considering all of the circumstances," id. at 688, evaluating the attorney's conduct "from counsel's perspective at the time" and in light of "prevailing professional norms," id. at 688-89. Because there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," id. at 689, the performance of trial counsel is deficient "only where, given the facts known at the time, counsel's choice was so patently unreasonable that no competent attorney would have made it," Knight v. Spencer, 447 F.3d 6, 15 (1st Cir. 2006) (internal quotation marks omitted).

To succeed on the prejudice prong, it is not enough for Rivera "to show that the errors had 'some conceivable effect on the outcome,'" but he is also not required to "prove that the

errors were more likely than not to have affected the verdict." González-Soberal v. United States, 244 F.3d 273, 278 (1st Cir. 2001) (quoting Strickland, 466 U.S. at 693). Instead, "[a] reasonable probability is one 'sufficient to undermine confidence in the outcome.'" Id. (quoting Strickland, 466 U.S. at 694). In essence, the prejudice inquiry is focused on "the fundamental fairness of the proceeding." Strickland, 466 U.S. at 696.

## B. Habeas Standard of Review

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254. AEDPA dictates that, in reviewing a state court adjudication on the merits of the petitioner's federal claim, federal courts ask whether the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2). Pursuant to this standard, a "state court's decision is not vulnerable unless it evinces some increment of incorrectness beyond mere error." Magraw v. Roden, 743 F.3d 1, 4 (1st Cir. 2014) (quoting Leftwich v. Maloney, 532 F.3d 20, 23 (1st Cir. 2008)). When combined with Strickland's already "highly deferential" standard for a trial attorney's conduct, 466 U.S. at 689, the AEDPA standard "is 'doubly' so," requiring the court to

ask "whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Harrington v. Richter, 562 U.S. 86, 105 (2011) (quoting Knowles v. Mirzayance, 556 U.S. 111, 123 (2009)).

However, the AEDPA standard only applies when the state court has addressed the merits of the petitioner's federal habeas claim. See Gray v. Brady, 592 F.3d 296, 301 (1st Cir. 2010). Of particular relevance here, when the state court has reached only one prong of the test for ineffective assistance of counsel, the other prong is reviewed de novo. See Rompilla v. Beard, 545 U.S. 374, 390 (2005); Dugas v. Coplan, 428 F.3d 317, 327 (1st Cir. 2005). The Massachusetts Appeals Court, having concluded that Rivera did not satisfy the performance prong, did not reach the merits of the prejudice prong.[3] Thus, with regard to the performance prong, Rivera must show that the state court's decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 562 U.S. at 103. With respect to the prejudice prong, however, we review de novo whether

---

[3] Its summary decision incorporates by reference pages of the Commonwealth's brief that primarily focus on the deficiency of Rivera's counsel's performance but cursorily argue in the alternative that Rivera did not satisfy the prejudice prong. However, because the court expressly stated that it was deciding Rivera's ineffective assistance of counsel claim on the performance prong, we do not treat its incorporation of the Commonwealth's brief as reaching the merits of the prejudice prong.

the effect of any error by Rivera's attorney is sufficient to undermine our confidence in the jury's verdict.

Where the district court in a federal habeas case does not undertake independent factfinding, as was the case here, "we are effectively in the same position as the district court vis-à-vis the state court record," and thus we review the district court's entire decision, including its application of the AEDPA standard, de novo.  Pike v. Guarino, 492 F.3d 61, 68 (1st Cir. 2007).

## III.

Rivera argues that Sistrand's failure to administer Miranda warnings before questioning him was such a clear violation of his Fifth Amendment rights that his attorney's failure to move to suppress his statements on that ground "fell below an objective standard of reasonableness."  Further, he argues that, because the statements amounted to a confession that he was involved in the altercation and were the only direct evidence of his intent in stabbing Williams, the failure to move to suppress them was prejudicial.  We consider each prong of the Strickland analysis in turn.

## A.    Performance

Under the familiar rule of Miranda v. Arizona, a suspect who is subject to "custodial interrogation" must first be informed of his Fifth Amendment privilege against self-incrimination and

- 12 -

his right to an attorney to safeguard that privilege. 384 U.S. 436, 444, 469 (1966); see Johnston v. Mitchell, 871 F.3d 52, 57 (1st Cir. 2017). The remedy for a violation of Miranda's "prophylactic rules, in the ordinary case, is the exclusion of evidence impermissibly gathered as a result of the violation." Johnston, 871 F.3d at 58. Here, it is undisputed that Sistrand did not administer Miranda warnings before questioning Rivera when he confronted him on the street. Thus, the issue of the deficiency of counsel's performance turns in the first instance on whether any "competent attorney" would nonetheless "think a motion to suppress would have failed." Premo v. Moore, 562 U.S. 115, 124 (2011). Under AEDPA, Rivera has the burden of showing that the Massachusetts Appeals Court's answer to this question "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 562 U.S. at 103.

## 1. Custody

Miranda's protections apply once "a person has been taken into custody or otherwise deprived of his freedom in any significant way." Beckwith v. United States, 425 U.S. 341, 347 (1976). "In determining whether an individual was in custody," we assess "all of the circumstances surrounding the interrogation," with the "ultimate inquiry" being "whether there was a formal arrest or restraint on freedom of movement of the degree associated

- 13 -

with a formal arrest." Stansbury v. California, 511 U.S. 318, 322 (1994) (per curiam) (internal quotation marks and alterations omitted).

Although the Commonwealth's brief to the Massachusetts Appeals Court argued that Rivera was not in custody when he made the statements to Sistrand, the court did not expressly address that argument, and appellee has not developed any argument in federal court that Rivera was not in custody at the time of his statements to Sistrand or that counsel reasonably could have believed on that basis that a suppression motion would fail. See Rivera v. Thompson, No. 13-11789-IT, 2016 WL 4273180, at *8 (D. Mass. Aug. 12, 2016) ("Neither Respondent nor the Massachusetts Appeals Court dispute that Rivera was in custody while lying face down on the street with an officer, with his gun drawn, standing over him."). Appellee has therefore waived those arguments. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (holding that party's failure to develop argument in appellate brief results in waiver).

In any event, pre-trial events substantially undermine the reasonableness of any belief by Rivera's counsel that a motion would not be successful because Rivera was not in custody. Although Rivera's counsel did not move to suppress Rivera's statements to Sistrand, she did move to suppress physical evidence and several other statements made by Rivera at the police station.

- 14 -

A suppression hearing was held during which Rivera's counsel elicited detailed testimony from Sistrand regarding his encounter with Rivera to support the argument that the physical evidence should be suppressed. At that hearing, the court expressly agreed with the contention that Rivera was in custody at the time Sistrand ordered him to the ground, even though he had not yet been arrested, stating, "I accept that the defendant is in custody from the minute he's placed at gunpoint on the ground." That the court was receptive to the argument that Rivera was in custody at the time he made the statements to Sistrand makes it even more incomprehensible that his attorney failed to move to suppress the statements before trial, particularly given the interrogative nature of the questions asked by Sistrand.

## 2. Interrogation

The Massachusetts Appeals Court held that the failure to move to suppress the statements was excusable on the ground that "the questions did not constitute interrogation for the purposes of Miranda warnings," Rivera, 2012 WL 1623373, at *1, and thus trial counsel could reasonably believe it would be futile to file a motion to suppress. That conclusion of the Court of Appeals is clearly contrary to the Supreme Court's definition of interrogation for Miranda purposes.

In Rhode Island v. Innis, 446 U.S. 291 (1980), the Supreme Court held that the term interrogation in Miranda refers

- 15 -

"not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. at 301 (footnote omitted). Appellee reads the second part of this definition as a restriction on the first, arguing that express questioning is interrogation "only when police conduct is 'reasonably likely to elicit an incriminating response from the suspect.'" To the contrary, the definition of interrogation in Innis encompasses any express question asked of a suspect in custody, subject to a few narrow exceptions. See United States v. Downing, 665 F.2d 404, 407 (1st Cir. 1981).

Here, although they were few in number, Sistrand asked Rivera express questions, including "what are you doing?" and "why?". We therefore do not need to determine whether Sistrand's words or actions were the "functional equivalent" of express questioning by evaluating whether his queries were "reasonably likely to elicit an incriminating response." Innis, 446 U.S. at 301; see United States v. Montgomery, 714 F.2d 201, 202 (1st Cir. 1983) ("Since the questioning here was express, we have no occasion to go farther. This was custodial interrogation."). In any event, the questions "what are you doing?" and "why?" when asked of a suspect who is seen fleeing from the direction of a stabbing and is bleeding from a cut on his hand are clearly reasonably likely

- 16 -

to elicit an incriminating response. Indeed, Sistrand's actions -- drawing his gun and ordering Rivera to stop and lay on the ground -- indicate that he suspected Rivera was involved in the stabbing that he was investigating.[4]

Appellee suggests that the fact that Sistrand's questions were "introductory" or "preliminary" precludes them from being interrogation. However, there is no such exception to the Supreme Court's definition of interrogation, nor does appellee point to any cases recognizing one. Whether Sistrand questioned Rivera soon after he encountered him on the street or hours later at the police station, his express questions were still interrogation under Innis. Therefore, the Massachusetts Appeals Court's conclusion that Sistrand's questions were not interrogation was clearly contrary to the Supreme Court's definition of interrogation.

### 3. Routine Booking Exception

Strickland obliges us "to affirmatively entertain the range of possible reasons . . . counsel may have had" for not moving to suppress Rivera's statements to Sistrand. Cullen v. Pinholster, 563 U.S. 170, 196 (2011) (internal quotation marks omitted). The only such reason proffered by appellee is that

---

[4] Sistrand stated at the hearing on Rivera's motion to suppress that his decision to stop Rivera was based on "the nature of the incident, the time of the morning, and what was put out over the radio," which was that a stabbing had taken place nearby.

- 17 -

counsel could reasonably have believed that Sistrand's questions fell under the "routine booking" exception to the Miranda rule. That assertion is implausible.

Appellee has failed to show as a threshold matter that the aptly named routine booking exception would apply here, where the questions were asked for investigative reasons, not routine administrative purposes, before Rivera was arrested and booked. The routine booking exception applies to "biographical data necessary to complete booking or pretrial services." Pennsylvania v. Muniz, 496 U.S. 582, 601 (1990) (plurality opinion) (internal quotation marks omitted). In Muniz, the plurality applied the exception to questions that were "requested for record-keeping purposes only" and were "reasonably related to the police's administrative concerns." Id. at 601-02 (internal quotation marks omitted); see also United States v. Sanchez, 817 F.3d 38, 46 (1st Cir. 2016) (holding that the exception applied where the officer "asked only routine questions to help with the booking process" at the police station); United States v. Reyes, 225 F.3d 71, 77 (1st Cir. 2000) (holding that "requesting [the defendant's] name, date of birth, and social security number" fell within the routine booking exception). Indeed, appellee primarily relies on United States v. Doe, 878 F.2d 1546, 1551 (1st Cir. 1989), where we held that the exception did not apply to biographical questions asked of an arrestee on a boat on the high seas, stating that "the

administrative need for initial background questioning seems less great here than typically present at a police station."

Moreover, although Sistrand did at one point ask Rivera his name, his other questions went well beyond simple identifying data to information that could be used as evidence of Rivera's involvement in a crime.  Unlike biographical questions asked during booking, which "do not, by their very nature, involve the psychological intimidation that Miranda is designed to prevent," Doe, 878 F.2d at 1551 (quoting United States v. Booth, 669 F.2d 1231, 1237 (9th Cir. 1981)), a police officer asking, with his gun drawn, "what are you doing?" and "why?" to a suspect laying prone in the street is precisely the type of coercive questioning that implicates a suspect's Fifth Amendment rights.[5]  Rivera's attorney therefore had no reason to believe that a motion to suppress the statements would be futile.[6]

---

[5] Additionally, there is "an exception to the exception" for "[c]ases in which law enforcement officers have reason to know that routine booking questions may indeed produce inculpatory responses." United States v. Scott, 270 F.3d 30, 43 n.8 (1st Cir. 2001). The questions asked of Rivera here were clearly not routine booking questions, but this exception makes counsel's failure to move to suppress Rivera's answers even more inexplicable because Sistrand had reason to know that questions asked under these circumstances -- Rivera was seen running from the direction of the address where the stabbing occurred, failed to stop when commanded to do so, and was bleeding from his hand -- were likely to produce an inculpatory response.

[6] In addition to the routine booking exception, the Supreme Court has recognized a public safety exception to the Miranda requirement, which allows police officers to ask "questions necessary to secure their own safety or the safety of the public."

- 19 -

## 4. Application of the AEDPA Standard

The district court held that the Massachusetts Appeals Court's ruling concerning Rivera's counsel's failure to move for suppression, even if erroneous, was not so unreasonable that it warranted relief under AEDPA. That holding takes the deferential standards of Strickland and AEDPA too far. Although it is true that assessing custodial interrogation is a fact-specific inquiry often susceptible to reasonable differences of opinion, this is not a close case. Posing the relevant AEDPA question, "whether it is possible fairminded jurists could disagree" that the state court's decision was inconsistent with a prior decision of the Supreme Court, Harrington, 562 U.S. at 102, we conclude that no fair-minded jurist could disagree that the Massachusetts Appeals Court's holding was contrary to governing Supreme Court law defining interrogation. Based on the plain statement of law in Innis, there is no reasonable argument that the express questions asked of Rivera with the purpose of ascertaining whether he was involved in the stabbing to which Sistrand was responding were not in fact interrogation. Nor is there any colorable argument that the routine booking exception would apply to questions that are neither routine nor asked for administrative purposes during

---

New York v. Quarles, 467 U.S. 649, 659 (1984). That exception is not at issue here, where Sistrand's questions were directed at investigating whether Rivera was involved in a crime, not protecting his safety or the safety of others.

- 20 -

arrest or booking. Thus, the Massachusetts Appeals Court's conclusion that counsel's performance was adequate because she could have reasonably believed that Miranda warnings were not required under the circumstances at issue "involved an unreasonable application of[] clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

## B. Prejudice

Rivera contends that the introduction of his responses to Sistrand's questions was prejudicial for two reasons: (1) the statements amounted to a confession that he was involved in the fight with Williams, and (2) the statements were the only direct evidence of his intent. With regard to his first argument, although Sistrand's testimony that Rivera stated that he "had a beef" with someone could be construed by the jury as Rivera confessing his involvement in the fight with Williams, that effect on the jury would not be prejudicial. Rivera's counsel did not dispute at trial that he was involved in a fight with Williams, and testimony of eyewitnesses at trial established that involvement. Rivera's argument at trial instead focused only on whether the government had proved beyond a reasonable doubt that he committed the stabbing with the requisite intent to kill or injure Williams. Thus, a confession that he was involved in the

- 21 -

fight in some way, without more, does not "undermine confidence in the outcome" of the trial.

Nonetheless, we are persuaded by Rivera's second argument that his statement that he "had a beef" because he had been "disrespected" provided crucial evidence of intent to murder Williams and thus was sufficiently prejudicial that there is a reasonable probability that trial counsel's error in failing to move to suppress the statements affected the jury's verdict.

Rivera's intent was critical in this case for two reasons. First, to convict him of armed assault with intent to murder, rather than the lesser included offense of armed assault with intent to kill, the jury had to find beyond a reasonable doubt that Rivera acted with malice. Thus, a partial defense to the armed assault with intent to murder charge was the presence of mitigating factors showing that Rivera did not act with malice. Second, as a complete defense to counts I and II, the jury was instructed to acquit Rivera of armed assault with intent to murder and assault with a dangerous weapon if it found that there was evidence that he acted in self-defense and the government failed to prove beyond a reasonable doubt that he did not do so. Rivera's counsel's failure to suppress his statements had a prejudicial effect on both of these defenses.

## 1. Partial Defense of Absence of Malice

The elements of armed assault with intent to murder are "assault and a specific intent to kill that equates with malice." Commonwealth v. Johnston, 845 N.E.2d 350, 354 (Mass. 2006). The Massachusetts Supreme Judicial Court has explained that "[m]alice necessarily exists when specific intent to kill is proved and there is no evidence of justification, excuse, or mitigation." Id. Therefore, where there is evidence of mitigating factors, such as "heat of passion induced by reasonable provocation, sudden combat, or excessive force in self-defense," the Commonwealth must prove the absence of mitigation beyond a reasonable doubt. Id. If the Commonwealth proves the other elements of armed assault with intent to murder but fails to prove the absence of mitigating factors, it "reduces the crime from assault with intent to murder to assault with intent to kill, a lesser included offense." Commonwealth v. Vick, 910 N.E.2d 339, 350 (Mass. 2009). The elements of armed assault with intent to kill are "assault, specific intent to kill, and [a] mitigating factor." Id. (quoting Commonwealth v. Nardone, 546 N.E.2d 359, 365 (Mass. 1989)) (alteration in original) (emphasis omitted).

Having concluded that there was evidence of mitigation, the trial court instructed the jurors that, even if they decided that Rivera stabbed Williams, they had to find the absence of mitigating circumstances beyond a reasonable doubt to find him

guilty of armed assault with intent to murder. Otherwise, the court explained, the jury should convict Rivera of the lesser included offense of armed assault with intent to kill. On the second day of deliberations, the jury sent a note to the court indicating that it had reached a verdict on two of the counts in the indictment but was having difficulty deciding on a verdict for armed assault with intent to murder. Although the jury ultimately convicted Rivera of armed assault with intent to murder after it was instructed to continue deliberating, the presence of mitigating factors was obviously a central issue in the jury deliberations because mitigation is the only difference between armed assault with intent to murder and the lesser included offense of armed assault with intent to kill.

Rivera's primary defense at trial was that the Commonwealth had failed to produce any eyewitness testimony regarding how the fight had started or what occurred during the fight, and that it therefore had failed to prove beyond a reasonable doubt the elements of the charged crimes, including specific intent and the absence of mitigating factors. Without Rivera's statements to Sistrand, the only evidentiary basis for the Commonwealth's assertion that Rivera initiated the fight with the intent to stab and kill Williams would have been Gonzalez's ambiguous testimony that he thought something had "triggered" Rivera. However, the jury may have disregarded or given little

weight to Gonzalez's suggestion that Rivera started the fight because Gonzalez was out of the room and did not actually hear what was said between Rivera and Williams. Moreover, the only eyewitness account of the fight itself was Gonzalez's testimony that the larger Williams had the smaller Rivera pinned to the ground and was punching him. Such testimony would permit the jury to conclude that Williams was the aggressor and Rivera merely acted "in the heat of passion" due to Williams' provocation. See Commonwealth v. Acevedo, 845 N.E.2d 274, 283, 284 (Mass. 2006) (describing "reasonable provocation" as when "a reasonable person in the defendant's position would have felt an 'immediate and intense' threat, and lashed out in fear as a result"); id. (stating that "[a]t times, even a single blow from the victim can constitute reasonable provocation" (quoting Commonwealth v. Amaral, 450 N.E.2d 142, 145 (Mass. 1983))).

Rivera's statements to Sistrand significantly change the mitigating factors analysis. Even with Rivera's statements, the jury had trouble deciding whether mitigating factors were present. Without them, it is unlikely that the jury would have found beyond a reasonable doubt that Rivera had not been reacting to Williams' provocation. Rivera's admission that he "had a beef with a nigger" because he had been "disrespected" provided crucial evidence to corroborate Gonzalez's statement that something "triggered" Rivera and reinforced the inference that Rivera initiated the fight. In

- 25 -

turn, if the jury concluded that Rivera started the fight, Rivera's statements strengthened the Commonwealth's argument that he did so with malice and the specific intent to kill Williams, rather than having been provoked by something Williams did.[7] Indeed, the Commonwealth seized on Rivera's statements in its closing argument, asserting that Rivera started the fight with the intention of stabbing Williams as retribution for being "disrespected," and drawing a connection between Rivera's statement that his "beef" was about being "disrespected" and Gonzalez's testimony that something "triggered" Rivera before he went outside.[8]

It is thus reasonably probable that, in the absence of Rivera's statements, the jury would have found that the Commonwealth had failed to prove the absence of mitigating factors,

---

[7] Rivera's statement that he "had a beef with a nigger" was especially prejudicial because Rivera used a racial slur to refer to Williams, who, according to witnesses, was the only black person present at the party. Brown testified that Rivera used the same slur toward him at the police station after being arrested. The testimony that Rivera twice used racial slurs could support a finding by the jury that the stabbing was motivated by racial animus. If the jury reached that conclusion, it would have another reason to think that the stabbing was premeditated rather than committed in the heat of the fight with Williams.

[8] Specifically, the Commonwealth repeated Sistrand's testimony that Rivera had said someone had disrespected him, and then said: "Remember Josue Gonzalez? Something triggered Eber Rivera. Something triggered that guy. Someone disrespected him."

and Rivera would not have been convicted of armed assault with intent to murder.

## 2. Self-Defense

In addition to instructing the jury on the lesser included offense of armed assault with intent to kill, the court gave the jury a self-defense instruction for both armed assault with intent to murder (count I) and assault and battery with a dangerous weapon (count II). Self-defense would be a complete defense to both charges. The court concluded that a self-defense instruction was appropriate based on its assessment that "the defendant was on the bottom and [Williams] was on top" and "[Williams] was getting the better of [Rivera]," and thus "the jury could find on that evidence that Mr. Rivera used the knife in self-defense." The court told the jurors that they must find Rivera not guilty on each of the two counts if there was some evidence that Rivera acted in self-defense and the Commonwealth failed to prove beyond a reasonable doubt that Rivera did not act in self-defense. The court defined self-defense as when "a person in defendant's circumstances would reasonably believe that he was about to be attacked and that he was in immediate danger of being killed or seriously injured, and there was no other way to avoid the attack."

Without Rivera's statements to Sistrand, Gonzalez's testimony that Williams was dominating the fight, coupled with the

- 27 -

inconclusive testimony regarding who started the fight, would make it difficult for the jury to conclude that the Commonwealth had proved beyond a reasonable doubt that Rivera did not act in self-defense. That Williams followed Rivera outside and then was seen beating him while he was on the ground would support a finding by the jury that Williams started the fight and was close to seriously injuring Rivera, who was unable to extract himself from the fight because he was pinned to the ground. The jury therefore could have concluded that Rivera had reason to believe that the only way to stop the beating was to stab Williams, thus leading to a finding that the Commonwealth had failed to prove beyond a reasonable doubt that Rivera did not act in self-defense.

On the other hand, with Rivera's statements before the jury, there was a reason for Rivera to initiate the fight -- he was "disrespected" -- and to have formed the intent to stab Williams before Williams had him on the ground. Because the jury could infer from Rivera's statements to Sistrand that he was intent on hurting Williams from the beginning of the fight, those statements permitted it to find that the Commonwealth had proved beyond a reasonable doubt that Rivera did not act in self-defense. Therefore, trial counsel's error in not moving to suppress Rivera's statements undermines our confidence in the jury's conclusion that Rivera was guilty of armed assault with intent to murder and assault and battery with a dangerous weapon.

**IV.**

For the reasons set forth, we conclude that Rivera's counsel's deficient performance was sufficiently prejudicial to amount to a violation of his Sixth Amendment right to counsel, and that the Massachusetts Appeals Court's decision to the contrary was an unreasonable application of Supreme Court precedent. Accordingly, we reverse the judgment of the district court and remand with instructions to issue the writ of habeas corpus.

So ordered.